# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | | |
|---|---|---|
| NEWELL RUBBERMAID, INC. and<br>GRACO CHILDREN'S PRODUCTS,<br>INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | CASE NO.<br>12-CV-3262 |
| vs. | ) ) | |
| FLEXFLO USA, INC., | ) ) | DEPOSITION OF<br>REBECCA JANET<br>QUIGGLE |
| Defendant. | ) ) | |
| ---------------------------- | ) ) | |
| FLEXFLO USA, INC. | ) ) | |
| Counter-claimant, | ) ) | |
| vs. | ) ) | |
| NEWELL RUBBERMAID, INC. and<br>GRACO CHILDREN'S PRODUCTS,<br>INC. | ) ) ) ) | |
| Counter-defendants. | ) | |

          The discovery deposition of REBECCA JANET

QUIGGLE taken by the defendant before Patricia

Nunes Kotarba, Certified Shorthand Reporter,

Registered Professional Reporter, at 9:27 a.m., on

September 4, 2013, at Newell Rubbermaid, Inc., 29

E. Stephenson Street, Freeport, Illinois.

 1                   A P P E A R A N C E S

 2          ERIC L. BARNUM, Attorney at Law,

 3    (Schiff Hardin, LLP), One Atlantic Center, Suite

 4    2300, 1201 West Peachtree Street, Atlanta, Georgia,

 5    appearing for the plaintiffs.

 6          ALAN BRYCE GROSSMAN, Attorney at Law,

 7    (Law Offices of Alan Bryce Grossman, P.A.), 10620

 8    Griffin Road, Suite 201 , Cooper City, Florida,

 9    appearing for the defendant.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                    I N D E X

2    EXAMINATION                                  PAGE

3

4    By Mr. Grossman  ...........................   5

5

6

7

8                  E X H I B I T S

9

10   Quiggle Exhibit No. 1 ......................   66

11   Quiggle Exhibit No. 2 ......................   72

12   Quiggle Exhibit No. 3 ......................   80

13   Quiggle Exhibit No. 4 ......................   81

14   Quiggle Exhibit No. 5 ......................   86

15   Quiggle Exhibit No. 6 ......................   90

16   Quiggle Exhibit No. 7 ......................   93

17   Quiggle Exhibit No. 8 ......................   96

18   Quiggle Exhibit No. 9 ......................   98

19   Quiggle Exhibit No. 10 .....................  102

20   Quiggle Exhibit No. 11 .....................  104

21   Quiggle Exhibit No. 12 .....................  104

22   Quiggle Exhibit No. 13 .....................  104

23   Quiggle Exhibit No. 14 .....................  104

24   Quiggle Exhibit No. 15 .....................  104

```
 1                                           PAGE

 2   Quiggle Exhibit No. 16 .....................  104

 3   Quiggle Exhibit No. 17 .....................  104

 4   Quiggle Exhibit No. 18 .....................  104

 5   Quiggle Exhibit No. 19 .....................  104

 6   Quiggle Exhibit No. 20 .....................  104

 7   Quiggle Exhibit No. 21 .....................  104

 8   Quiggle Exhibit No. 22 .....................  127

 9   Quiggle Exhibit No. 23 .....................  130

10

11

12

13   Signature Page .............................  136

14   Reporter Certificate .......................  137

15

16

17

18

19

20

21

22

23

24
```

1              REBECCA JANET QUIGGLE,

2  having been first duly sworn, was examined and

3  testified as follows:

4                  EXAMINATION

5  BY MR. GROSSMAN:

6     Q.   Good morning.  Would you please state your

7  full name for the record?

8     A.   Rebecca Janet Quiggle.

9     Q.   Good morning, Ms. Quiggle.

10    A.   Good morning.

11    Q.   My name is Alan Grossman.  I am here

12  representing Flexflo, USA, Inc. in the case of

13  Newell Rubbermaid, Inc. and Graco Children's

14  Products, Inc. versus Flexflo USA, Inc., which is

15  in the United States District Court for the

16  Northern District of Georgia in the Atlanta

17  District under Case No. 12-CV-3262.

18         And my first question for you is what is

19  your residence address?

20    A.   104 North Green Avenue, Freeport, Illinois,

21  61032.

22    Q.   Okay.  Ms. Quiggle, have you had your

23  deposition taken before for any occasion?

24    A.   No.

1    Q.   Okay.  So what I'm going to do is give you

2    a brief introduction into the process here and then

3    we will endeavor to pursue it in terms of the

4    information that I will be requesting of you.

5          So this process is simply where I have the

6    opportunity to ask you questions regarding the case

7    that I described to you.  And your job is to answer

8    them to the best of your ability.  It's not a

9    tricky process.  I don't intend to trick, I don't

10   intend to do anything but hopefully get the

11   information that's inside your head as much as I

12   can.  So I ask you the question and you provide an

13   answer.

14          If at any time the question is unclear,

15   which happens, just let me know.  This is not --

16   there is no particular formality to it.  You just

17   say that you don't really understand it, can you

18   rephrase it or whatever, and I will be happy to do

19   that.

20          If at any time you want to take a break,

21   and we do take breaks on occasion, that's fine.

22   Just let me know.  If you have some emergency that

23   somehow pops up in your head or by cell phone, of

24   course let me know.  We can discuss that as well.

1          When I ask the question, I am entitled to

2     your best answer.  If you know the answer, you

3     provide it to me verbally.  The court reporter is

4     here to take down what we're saying today, so that

5     requires verbal or oral responses.  Shaking the

6     head, shrugging of the shoulders, hand gestures

7     can't be taken down, and we will, if they happen,

8     we may actually describe them.  So preferably just

9     provide verbal, oral responses and then we have a

10    clean record.

11         There may be occasion that Mr. Barnum, the

12    attorney -- your attorney today sitting to your

13    left will interpose an objection that he will state

14    for the record.  That objection primarily will be

15    between me and him and the judge, if necessary.

16    The question will still be answered by you unless

17    Mr. Barnum instructs you not to answer it.  And if

18    he does so, I think it will be clear to you that

19    you will be told not to answer the question.

20         When I ask the question, you provide an

21    answer.  If you don't know the answer but you have

22    a reasonable estimate, I'm entitled to that as

23    well.  If you have sort of maybe a vague memory,

24    not entirely certain, I'm still entitled to what

1   information you can provide.  You do not

2   necessarily have to guess.  If you don't know and

3   you don't have an estimate or some kind of

4   reasonable response, guessing is really not the

5   best way to respond.  And it really doesn't help

6   the process very much either.  So -- but do your

7   best to understand what I'm asking and provide your

8   best answer.

9           You did take an oath just now of course.

10  A.    Yes, I did.

11  Q.    You do understand the nature of an oath;

12  correct?

13  A.    Yes, I do.

14  Q.    Okay.  Just, if you would, tell me what is

15  your understanding of the oath that you just took?

16  A.    That I am to tell the truth and answer

17  questions to my best knowledge.

18  Q.    Okay, very good.  Perfect.  Thank you.

19          Okay.  So we'll get started.  You're here

20  today at my request on behalf of Flexflo USA

21  through Mr. Barnum's office.  And you are here

22  voluntarily; correct?

23  A.    Correct.

24  Q.    We didn't serve a subpoena on you or in any

Page 9

1    way force you to come?

2        A.    No.

3        Q.    Okay.   In preparation for today's

4    deposition did you review any documentation that is

5    in any way related to the current case?

6        A.    Yes, I did.

7        Q.    What did you review?

8        A.    I reviewed, what are those things called

9    right there in front of you?

10       Q.    Depends on what you are referring to.

11       A.    It's a notice of disposition of Sue

12   Pfeiffer and of Gary Popp.   I read over those.   And

13   I also read over some past e-mails.

14       Q.    Okay.   Let me offer one correction that I

15   believe -- you probably didn't review the notice,

16   but an affidavit?

17       A.    Oh, I'm sorry, that's exactly what it was.

18       Q.    Because I know we didn't do a notice for

19   Ms. Pfeiffer.

20       A.    Right.

21       Q.    Okay.   So your testimony is corrected then,

22   that you reviewed two affidavits.

23       A.    Two affidavits.

24       Q.    Of Mr. Popp and Ms. Pfeiffer?

1     A.    Yes.

2     Q.    Okay.  And some e-mails.  Do you recall the

3  e-mails that you reviewed?

4     A.    Well, yes.

5     Q.    About how many do you recall reviewing?

6  Your best estimate again.

7     A.    Maybe three, four.

8     Q.    What do you recall of the contents of those

9  e-mails?

10    A.    That there was a request for extended

11  terms.

12    Q.    Okay.

13    A.    Okay.  And there was also some e-mails

14  where it was made clear that we were not going to

15  get paid in the near future.

16    Q.    Okay.  So about two or three.  Those

17  e-mails were sent about what time frame, if you can

18  know?

19    A.    I believe about October of 2011.

20    Q.    2011 October?  Okay.  Very good.  In

21  preparation for this deposition did you discuss

22  your deposition or your expected answers with

23  anyone except for Mr. Barnum and anyone in his

24  firm, as well as anyone within the legal department

1   of Newell Rubbermaid?  So that leaves people like

2   Mr. Popp, Ms. Pfeiffer, anybody within your

3   department perhaps?  Anybody else?

4       A.   Actually, no.

5       Q.   Okay.  Thank you.  How long have you

6   resided at your current address?

7       A.   Seventeen years.

8       Q.   Okay.  Where did you reside before that?

9       A.   Rural Route 2, Freeport, Illinois.

10      Q.   Okay.  So you're a Freeport girl?

11      A.   For the most part.

12      Q.   For the most part, okay.  Would you just

13  simply summarize your education starting with the

14  end of high school?

15      A.   Okay.  Graduated from high school.  I went

16  to Northern Illinois University studying chemistry

17  for three years.  Got married, had a kid.  Then I

18  went to culinary arts school and I taught for Rock

19  Valley College in culinary arts -- home economics

20  department.  And at the same time I also worked in

21  the field of trading precious metals and chemicals.

22  And at the same time started actually my career in

23  credit.

24           Now, I've taken a lot of various classes in

1    and courses through Columbia, Highland, Rock

2    Valley.  So --

3        Q.   Columbia, Highland and Rock Valley, what

4    are those?

5        A.   Columbia College.

6        Q.   Okay.

7        A.   Rock Valley College in Rockford, and

8    Highland Community College here.  And I've also

9    taken extensive classes with Dun & Bradstreet --

10   I'm sorry, yeah, Dun & Bradstreet, and credit --

11   different credit associations.

12       Q.   Okay.  Did you earn a degree of any kind

13   after high school?

14       A.   Yes.

15       Q.   What degree is that?

16       A.   That would be in culinary arts.

17       Q.   Culinary arts, okay.  Any other degrees?

18       A.   Not degrees.  I'm certified in several

19   things.

20       Q.   Certified in what?

21       A.   I'm certified in arbitration negotiation

22   and mediation.  I'm a certified manager.  I'm a

23   certified international credit professional.

24       Q.   Okay.  So let's take those one at a time.

1    Arbitration mediation?

2        A.    Mediation and negotiation.

3        Q.    And when did you obtain that certification?

4    And I don't need exact dates by any means.

5        A.    Okay.  About 2003, 2004.

6        Q.    Okay.  Why did you get that certification?

7        A.    I like to study and it intrigued me.

8        Q.    Okay.  Does that certification entitle you

9    to do things as an arbitrator, mediator, negotiator

10   that someone without that certification could not

11   do?

12       A.    Yes.

13       Q.    What is that?

14       A.    It allows me to either negotiate contracts,

15   whatever, mediate or arbitrate -- arbitration.  I

16   actually have used it in mediation.

17       Q.    Okay.  Let's talk about that.

18       A.    Sure.

19       Q.    You have been -- you have served as a

20   mediator?

21       A.    Yes.

22       Q.    How many times?

23       A.    Five.

24       Q.    Okay.  And in what types of matters were

1    you the mediator for?

2         A.    I mediated gangs.

3         Q.    Gangs?

4         A.    Um-hum.

5         Q.    Where?

6         A.    Scott County, Iowa.

7         Q.    Okay.  What were -- what were the issues

8    that were being resolved?

9         A.    Actually probably the most lengthy was

10   against a gang, okay, members of a gang and a

11   landlord.

12        Q.    And other than gangs, is there any other

13   types of mediation or arbitration?

14        A.    Not on that level, no.

15        Q.    Okay.  The one thing I'm not real clear on

16   is when you say you can negotiate?

17        A.    Contracts.

18        Q.    For anybody or --

19        A.    Well, it would depend -- no.

20        Q.    Okay.  Can you explain that a little bit

21   for me?

22        A.    I served on county board.

23        Q.    Okay.

24        A.    Negotiating contracts with unions.

1      Q.   Oh, I see, okay.  I understand.  All right.

2   Very good.  You had a second certification.  I

3   didn't catch all three.  What was the second one?

4      A.   It was credit -- I'm sorry, certified

5   manager.

6      Q.   And --

7      A.   Just as managerial skills.

8      Q.   Okay.  When did you obtain that

9   certification?

10     A.   2000, 2001.

11     Q.   And what does that provide to you as

12   compared to someone who doesn't have that

13   certification?

14     A.   I get initials behind my name.

15     Q.   Oh.  Looks good on the paper; right?  Has

16   that been, in your view, an asset in your career?

17     A.   No.

18     Q.   No, not at all?

19     A.   No.

20     Q.   Has it been useful to you in any way?

21     A.   I mean obviously there is things that you

22   pick up in any class that you use.

23     Q.   Okay.  And the third one was?

24     A.   International credit professional.

Page 16

1      Q.    Okay.  Tell me about that.

2      A.    It's a class that I took through a credit

3  organization.  It's very, very lengthy.  Tested.

4  And it literally walks you through the aspects that

5  you are going to run into in working with

6  international credit.  Your policies, your laws,

7  different -- what am I trying to say --

8  documentation that are required.

9      Q.    Okay.  And when did you obtain this

10  certification?

11      A.    Probably 2004, 2005.

12      Q.    Okay.  And was that required for your

13  employment?

14      A.    No, it was not.

15      Q.    It was just something you chose to do as

16  well?

17      A.    Yes.

18      Q.    You enjoy classes and studying?

19      A.    I do.

20      Q.    Good for you.  Let's talk about your

21  employment.  That's a good segue.  I take a segue

22  when I can get one.  You are currently employed?

23      A.    Yes, I am.

24      Q.    And where?

1      A.    Newell Rubbermaid in Freeport, Illinois.

2      Q.    And what is your title at Newell

3   Rubbermaid?

4      A.    Senior analyst.

5      Q.    And what is the job description of a senior

6   analyst?  Did I say that right?  Senior analyst at

7   Newell Rubbermaid?

8      A.    Actually right now I am working pretty much

9   on special projects.

10      Q.    Can you be a little more specific on what

11   that means?

12      A.    I have just finished a very huge project

13   with doing all documentations for direct imports

14   for one of our larger customers.

15      Q.    Okay.  Where is that customer located?

16      A.    In New York.

17      Q.    And the imports are from what location?

18      A.    China.

19      Q.    China specifically, okay.  How long did

20   that project take?

21      A.    About six weeks.

22      Q.    Okay.  And is that the only thing you

23   worked on during the six weeks?

24      A.    Pretty much.  It was over a $3 million

Page 18

1    project.

2        Q.    And is it finished?

3        A.    I have finished and receiving payment.

4        Q.    Congratulations.

5        A.    Thank you.

6        Q.    Prior to that did you have other types of

7    projects?

8        A.    I work on collections.

9        Q.    Okay.

10       A.    And I have certain accounts.  We have what

11   we call vendors.  And I work on -- we sell to them,

12   they sell to us, keeping those clean.

13       Q.    Okay.  Do you have a specific, let's say

14   roster of vendors that you work for?

15       A.    Yes, I do.

16       Q.    Okay.

17       A.    The other thing I work on is accounts that

18   do not pay.  And before they are actually sent to

19   an outside collection agency I'll make one last

20   effort to get paid.

21       Q.    Okay.  So were you doing those two types of

22   activities while you were involved with this China

23   project, or did those get pushed back?

24       A.    They kind of got pushed back a little bit,

Page 19

1   so --

2       Q.   So the China project was more of a real

3   special thing?

4       A.   Definitely.  Yeah.

5       Q.   It's not your typical work?

6       A.   No.

7       Q.   So your typical work would be more --

8       A.   With the collections.

9       Q.   -- collections?  So when I asked if you had

10  a roster of accounts that you work from,

11  approximately how many are you responsible for?

12      A.   Ones that are assigned specifically to me,

13  probably 15.

14      Q.   Okay.

15           MR. BARNUM:  I'm sorry.  Was it 15 or 50?

16           THE WITNESS:  Fifteen just assigned to me.

17           MR. BARNUM:  Okay.

18  BY MR. GROSSMAN:

19      Q.   And does that number change?

20      A.   Yes.

21      Q.   How frequently?

22      A.   It can change daily or it might not change

23  for months.

24      Q.   Okay.  So it's just a matter of what each

1   particular account if they get resolved?

2       A.   Um-hum.

3       Q.   And describe for me what your job is with

4   regard to those accounts, those 15 or so that are

5   assigned to you.

6       A.   Making sure that we get paid.

7       Q.   Okay.  Can you be a little more descriptive

8   of your duties?

9       A.   I will send out spreadsheets.

10      Q.   Okay.

11      A.   I will send out invoices if they are

12  requested.  I will contact the customers either by

13  e-mail or phone depending on where they are at.

14  And if there is anything that comes in that we do

15  not know where the money goes, I will be contacting

16  them to ask what do you want me to do with this?

17      Q.   Okay.  So you're employed by Newell

18  Rubbermaid?

19      A.   Yes.

20      Q.   And when did you start working there?

21      A.   1992 or '93.

22      Q.   Okay.  In this job that you were just

23  describing at Newell Rubbermaid, you're handling

24  however many accounts you have assigned to you,

1   Newell Rubbermaid, as I understand, has different

2   subsidiaries that it owns and one of which is

3   involved in this case, Graco Children's Products.

4   How many subsidiaries are you familiar with that

5   are owned by Newell Rubbermaid?

6       A.   All of them.

7       Q.   How many are there?  And I don't need an

8   exact number.

9       A.   I honestly, other than maybe -- eight.  And

10  there is a lot more than that.  I'm not completely

11  familiar with all of the foreign subsidiaries.

12      Q.   Okay.  And how many of those have been

13  assigned to you?  What types of these subsidiaries

14  are you working on collecting?

15      A.   All of them.

16      Q.   All of them, okay.  Can you identify some

17  of those for me?

18      A.   Rubbermaid, Rubbermaid Commercial, Sanford,

19  Graco, Irwin, Lenox, Levolor.  Up until recently,

20  Amerock, Shur-line.  I'm probably forgetting a

21  whole bunch more.  Those are the big ones.

22      Q.   So you're involved in collecting payment

23  for Newell Rubbermaid resulting in sales of

24  products; is that accurate?

Page 22

1      A.    Yes, that is accurate.

2      Q.    At what point does an account get to your

3   attention in the payment process of when products

4   are sold to customers?  Do you understand my

5   question?

6      A.    Yes, I do.  And I'm going to answer that in

7   two separate ways.

8      Q.    Please do.

9      A.    Because my job is two separate things,

10  okay.

11     Q.    Okay.

12     A.    The first one being the accounts that I

13  have as vendors, okay, or special maintenance

14  accounts.  I keep an eye on those every day.  When

15  it goes past due one day, I know it.  The other

16  accounts do not normally come to my desk until they

17  have been final demanded.  And that means that they

18  are probably more than 90 days -- they would be

19  more than 90 days past due.

20     Q.    Okay.  Speaking of the vendors that you say

21  you handle special, I'm not clear on how you are

22  using the word vendors.

23     A.    Okay.  A vendor is we will sell raw

24  material to a vendor, they will make it into

1    something and sell it back.

2        Q.    What types of raw material does Newell

3    Rubbermaid sell?

4        A.    Ink, fill pens.  Ink is probably the one I

5    know the best.

6        Q.    Okay.  And then the others you say -- when

7    you say final demanded, that means what?

8        A.    That would be any account that Newell

9    Rubbermaid and its subsidiaries may have that has

10   not paid their bill, has gone 90 or more days past

11   due, and has been recommended by a collector that

12   they do not feel that it is a viable debt that can

13   be collected at their level.

14       Q.    Okay.  And how do you typically receive

15   these accounts?

16       A.    Gary throws them on my desk.

17       Q.    Okay.  You referring to Mr. Popp?  Gary

18   Popp?

19       A.    Yeah.

20       Q.    Okay.  What does he actually provide to

21   you?

22       A.    He will provide any documentation we have.

23   Statement of the account.

24       Q.    Okay.

Page 24

1       A.    Okay.   Any kind of notes that might be

2   helpful for me to know who to talk to.

3       Q.    Okay.   And what is the first thing you

4   typically would do with those accounts?

5       A.    Well, first thing I would do is look them

6   up in the system just to see for myself that we are

7   not making any mistake.

8       Q.    Okay.

9       A.    And then I would initiate either an e-mail

10  or a phone call, depending on the location of the

11  customer.

12      Q.    Is there any written policy that you are

13  following in your initial activity as to these

14  accounts?

15      A.    Yes.   Up to the final demand it's very well

16  documented what we do.

17      Q.    Okay.

18      A.    This is -- what I am doing is fairly new

19  within the last four or five years, okay, of going

20  one step further and talking to the customer one

21  last time.

22      Q.    Okay.

23      A.    Rather than losing money and placing it

24  with an outside agency.

1     Q.    Okay.  Do you have contact with any of

2   these customers prior to the time it's placed on

3   your desk?

4     A.    I could have.

5     Q.    Okay.  For what reasons?

6     A.    If I'm helping do collections I might pick

7   up someone else's work list.  There would be a

8   possibility that I would make contact with a

9   customer then.

10    Q.    I see.  So let me -- let's narrow in on

11  Graco since that's obviously the subsidiary at

12  interest today.  Graco, what types of products does

13  Graco sell?

14    A.    Strollers, baby strollers, baby car seats.

15    Q.    Okay.  And are you involved in any way in

16  the sale of the product by Graco?

17    A.    No.

18    Q.    Okay.  I guess I have to back up a little

19  bit.  You are employed in what department at Newell

20  Rubbermaid?

21    A.    The credit collections department at

22  corporate shared services.

23    Q.    Okay.  That's of course here in Freeport?

24    A.    Correct.

Page 26

1     Q.    And your direct supervisor?

2     A.    Is Gary Popp.

3     Q.    Okay.  How long has he been your

4  supervisor?

5     A.    As long as I've been here.

6     Q.    Okay.  So after sales are made by Graco,

7  and your department has nothing to do with the

8  sales?

9     A.    Correct.

10    Q.    So is it accurate to say then in terms of

11 the prices that are established for the products,

12 your department has nothing to do with that either?

13    A.    I don't know a thing about them.

14    Q.    Does your department -- are you involved in

15 any way in the payment terms for the customer?

16    A.    Not now, no.

17    Q.    Okay.  Were you at any time?

18    A.    Many, many years ago, yes.

19    Q.    Okay.  How long ago are we talking about?

20    A.    Oh, 2000 and -- probably before 2007.

21 2006, somewhere in there.

22    Q.    So prior to the account coming to your

23 attention, it is, from my understanding, in the

24 hands of Mr. Popp?

Page 27

1      A.    Which account?

2      Q.    Well, the ones that you are assigned to

3    from Mr. Popp.  You say he puts them on your desk?

4      A.    That -- okay, that would be the ones that

5    have reached their maximum time with not paying.

6      Q.    Does Mr. Popp get involved in collection

7    activity prior to him handing the file to you?

8            MR. BARNUM:  Objection.  Calls for

9    speculation.  If you know.

10   BY MR. GROSSMAN:

11     Q.    If you know.

12     A.    I don't know.

13     Q.    Okay.  Do you know what activities -- okay.

14   Generally speaking, do you know what activities are

15   involved prior to it coming to the collections

16   department, your department?

17           MR. BARNUM:  Objection.  Vague.

18   BY MR. GROSSMAN:

19     Q.    I'm talking about in terms of the payment.

20   In other words, a Graco account is beyond the terms

21   of the contract, okay?

22     A.    Okay.

23     Q.    Which is, in our case, a 60-day payment

24   term from delivery.  So after 60 days do you know

1    what activities or do you know who's handling any

2    particular account before it gets to you?

3            MR. BARNUM:  Objection.  Vague.

4    BY MR. GROSSMAN:

5       Q.   You can answer the question.

6       A.   I can answer it.  I don't know.

7       Q.   You don't know, okay.  Can you give me a

8    description as to how your department is organized?

9       A.   The collections department?

10      Q.   Yes, please.

11      A.   Okay.  We have an outbound team which makes

12   all outbound calls.  We have an inbound team which

13   makes all inbound calls, or takes all inbound

14   calls.  I guess that's our part of the

15   collection -- credit collections.

16      Q.   So which part are you?

17      A.   Collections.

18      Q.   Okay.  I'm a little confused.  You said

19   there is an outbound team?

20      A.   And an inbound team.

21      Q.   So which team are you on?

22      A.   I would say I'm on an outbound team, okay.

23      Q.   Let me make sure I'm understanding this.

24   An outbound team makes calls?

Page 29

 1    A.    Going out.

 2    Q.    Okay.

 3    A.    An inbound team takes calls coming in.

 4    Q.    So how is that distinguished?  Because

 5  obviously if you are calling someone to speak to

 6  them and you don't get anyone and leave a message,

 7  they call you back.  That's not what you're talking

 8  about?

 9    A.    Yeah, that's exactly what I'm talking

10  about.

11    Q.    Oh, it is?  Really?  Okay.  Do customers

12  ever call on their own initiative?

13    A.    They might.

14    Q.    They might.

15    A.    That goes to the inbound team.  If the

16  phone rings and someone answers it, that's the

17  inbound team.

18    Q.    I see.  Okay.  So what if it's a follow-up

19  to a phone call that you made?

20    A.    It would go to the inbound team.

21    Q.    Would they -- is there --

22    A.    Unless it's one of my specific accounts.

23  Then it would come directly to me.

24          MR. BARNUM:  Ms. Quiggle, make sure you

Page 30

1   allow counsel to finish his question before you

2   answer it.

3   BY MR. GROSSMAN:

4       Q.   That's okay.  That's fine.  Okay.  So I

5   think you explained to me that you have some

6   specific accounts.  The number is about 15.  It

7   changes, I understand.  Okay.  Do you have other

8   accounts that you work on as well?

9       A.   At times.

10      Q.   At times.  What are those times?

11      A.   When I have time.

12      Q.   But are they not -- are they your accounts?

13      A.   No.

14      Q.   They are someone else's accounts?

15      A.   They are not assigned to any one specific

16  person.

17      Q.   So what's the distinction within your

18  department as to when accounts are assigned and

19  when they are not assigned?

20      A.   In my case I'm handling specific vendors.

21      Q.   Okay.

22      A.   Okay.  Or accounts that have been final

23  demanded prior to being placed for collection.

24      Q.   Okay.  So --

Page 31

 1      A.    I'm the only one who does that.

 2      Q.    You're the only one who does that.   Okay.

 3  How many other collectors are within your

 4  department?

 5      A.    Nine I think.

 6      Q.    Okay.   And can you tell me if that has

 7  changed in the last two years?

 8      A.    I believe at one time there was 10.

 9      Q.    Okay.   Somebody left?

10      A.    Right.

11      Q.    Who was that?

12      A.    Anna Folgate left and was not replaced.

13      Q.    Her name is not familiar to me so probably

14  not important.   All right.   So your direct

15  supervisor is Gary Popp; am I right?

16      A.    Yes.

17      Q.    Do you have subordinates that report

18  directly to you?

19      A.    Not anymore, thank you.

20      Q.    You did?   Until when?

21      A.    2010.

22      Q.    2010?

23      A.    Yes.

24      Q.    Okay.   Who were the people by name that

1   reported to you?

2       A.   I had Kim Ruthe, Peggy Larson, Lee

3   Gorgeous, Millie -- Milagrose Sanchez, Cynthia

4   Lefever, Anna Folgate, Sheila Erb, Joanie Benson.

5   Did I say Kim Ruthe?

6       Q.   Yes, you did.

7       A.   Oh, okay.  Melanie Cannon.

8       Q.   What were their jobs when they were your

9   subordinates?

10      A.   Calling people to collect money.

11      Q.   Do you -- within the organizational

12  structure are there other individuals who have the

13  same, let's say ranking as you do?  That's probably

14  not the right word.  That report directly to Mr.

15  Popp?

16      A.   No.  And I need to correct something.

17      Q.   Please do.

18      A.   Okay.  My direct supervisor is Deb Stenbeck

19  now.  And that has changed within the last year.

20      Q.   Approximately when?

21      A.   About a year ago.

22      Q.   Okay.

23      A.   She became a manager and I went under her.

24      Q.   Okay.  Prior to that --

1    A.    Mr. Popp.

2    Q.    -- it was Mr. Popp?

3    A.    Um-hum.

4    Q.    So you're reporting to?

5    A.    Deborah Stenbeck.

6    Q.    Stenbeck.  And she reports to Gary Popp?

7    A.    Yes.  I cannot tell you that she reports to

8    Mr. Popp.  I do not know that.

9    Q.    Okay.

10   A.    She is a manager.

11   Q.    I see.  But before that you reported

12   directly to Mr. Popp?

13   A.    Yes.

14   Q.    Okay.  Do you know if anyone else is

15   currently reporting directly to Mr. Popp?

16   A.    I cannot tell you that.

17   Q.    You don't know that?

18   A.    Hum-um.

19   Q.    Okay.  Let's talk about the credit for

20   Graco's customers, okay?  Do you have any knowledge

21   as to how the credit limits are established by

22   Newell Rubbermaid?

23   A.    No, sir, I do not.

24   Q.    That is not within your department?

Page 34

1      A.    It's not within my realm of expertise.

2      Q.    I'm sorry?

3      A.    Not within my realm of expertise.

4      Q.    Do you have any knowledge though?  Maybe

5   not an expert, but some knowledge?

6      A.    I honestly can tell you structure now, I do

7   not know how those are set.

8      Q.    Okay.  Do you know who would be involved in

9   establishing credit limits?

10      A.    Yes, I do.

11      Q.    Who is that?

12      A.    It would be Roxanne Berg's risk group.

13      Q.    And that's composed of who?

14      A.    I can tell you some of the people.  I'm

15   sorry, I'm not familiar with all of them.

16      Q.    Uh-huh.

17      A.    Would you like?

18      Q.    Please.

19      A.    Ray Newcomer, Sue Pfeiffer.  They just had

20   some changes.  Melanie -- and I'm sorry, I don't

21   know her last name.

22      Q.    Okay.  In your work in collecting accounts,

23   do you have occasion to communicate with the risk

24   department?

1      A.    On occasion.

2      Q.    And for what types of reasons would you be

3  doing that?

4      A.    If I get anything that is not something

5  that I'm responsible for or I have the authority

6  for, it would be passed on to the risk department.

7      Q.    Okay.  Let's discuss the authority that you

8  have.  Is there a written policy regarding your

9  authority to settle accounts?

10     A.    Yes.

11     Q.    Okay.  Where is that written?

12     A.    We have a whole big book.

13     Q.    Okay.

14     A.    Policies and procedures.

15     Q.    Has that been in existence for awhile?

16     A.    Actually it's been fine tuned.  I think it

17  probably was -- I can't say that, I don't know.

18  It's been fine tuned over the last five years.

19     Q.    Okay.  Do you know who was involved in fine

20  tuning the policies?

21     A.    Not for sure.

22     Q.    Okay.  Did you review the policies at any

23  time?

24     A.    Prior to or before?  I mean before they

Page 36

1    were made or after they were done?  Have I read

2    them?  Yes.

3        Q.   Yeah.  When?

4        A.   Well, I would say I probably go through

5    them at least once a year.

6        Q.   Do you refer to the written policies as

7    part of your day-to-day activities in your

8    collection activities?

9        A.   I have been doing this for almost 20 years.

10   What do you think?

11       Q.   Well, that's why I have to ask the

12   questions because what I think matters little.

13       A.   Unless I have a specific doubt?

14       Q.   Yes.

15       A.   No.

16       Q.   Okay.  Fair enough.  So the authority you

17   have to settle accounts, and I'm going to remain

18   general -- speaking generally for the moment.  We

19   will get into the specifics of my client's account

20   not too late this morning.  Is there a dollar

21   amount of authority you have or is there some other

22   way of describing it?

23       A.   Okay.  First of all, I think I need to

24   correct one of the words you are using.

1    Q.    Please do.

2    A.    Okay.  You're saying settle an account.

3    Q.    Okay.

4    A.    I do not settle them, I collect them.

5    Q.    You collect accounts, okay.

6    A.    Which is very much different than settling.

7    Q.    Well, explain the distinction as you

8  understand it.

9    A.    I will not settle an account as you only

10  have to pay this much.

11    Q.    Oh, I understand, okay.

12    A.    I may tell them I will take a payment of

13  until the account is paid in full.

14    Q.    So if there is a specific amount due from a

15  customer?

16    A.    That's what I'm going to get paid.

17    Q.    Your job is to collect that money?

18    A.    Exactly right.

19    Q.    But you're willing to work out perhaps

20  payment arrangements?

21    A.    If it's at all possible.

22    Q.    Okay.  But you do not -- as I understand

23  your testimony, you do not settle, meaning you

24  don't accept less than the full balance due?

1    A.    No, sir, I do not.

2    Q.    Okay.  Does that include -- if there is a

3  balance due that is slow to being paid by a

4  customer, is it the policy of Newell Rubbermaid to

5  add interest to the amount due?

6    A.    Not as far as I know.

7    Q.    Okay.  And you don't require an interest

8  factor in your calculation?

9    A.    I have never added an interest.

10   Q.    Okay.  Thank you.  When customers are

11  paying -- and we can still focus on Graco to the

12  extent that it makes a difference in your mind.  A

13  customer is paying for products that are purchased

14  from Graco, not a late payment, just a regular

15  payment, does you or your department have any

16  involvement in the collection of that payment --

17  receipt of that payment, I should say?  Do you

18  understand my question?

19   A.    No, I don't.

20   Q.    In the normal course of business the

21  products are sold to the customer, invoices are

22  generated, and the customer then at some point

23  hopefully pays?

24   A.    Oh, okay.

Page 39

1      Q.    I'm asking about the receipt of those

2   payments.   Not late payments or anything like that,

3   just regular payments.

4      A.    No.

5      Q.    How is that -- how are those payments

6   handled?

7      A.    They are mailed in to a lockbox.   They are

8   wired in to an ACH by ACH.   That's pretty much the

9   way it goes.

10      Q.    What -- if you know, what department

11   handles just processing those payments?

12      A.    Well, accounts receivable.   But the checks

13   go to a lockbox at the bank and they are processed

14   there.

15      Q.    Oh, the bank processes them and then the

16   accounts receivable makes sure they are accounted

17   properly and all that kind of stuff?

18      A.    Right.

19      Q.    You're not involved in any of that?

20      A.    Not at all.

21      Q.    I understand.   Okay.   As far as the

22   creation of invoices for the products that are sold

23   through Newell Rubbermaid or its subsidiaries, are

24   you involved in that process at all?

Page 40

1      A.    No.

2      Q.    Not within your department?

3      A.    No, sir.

4      Q.    Okay.  We are going to shift gears a little

5   bit here and discuss my client, Flexflo, USA, Inc.

6   Are you familiar with Flexflo, USA?

7      A.    Yes, I am.

8      Q.    Okay.  Tell me your understanding of the

9   business of Flexflo, USA?

10     A.    My understanding is that we would sell them

11  product and it would ship within I guess called

12  drop ship directly into Venezuela.

13     Q.    Drop ship means what?

14     A.    We would ship it to Venezuela.

15     Q.    Okay.  You defined it for me.

16     A.    Yeah.  We wouldn't send it to a warehouse

17  here that's Flexflo's or whatever.  We would

18  directly ship.

19     Q.    And who at Flexflo -- have you dealt with

20  Flexflo, USA?

21     A.    Yes.

22     Q.    Okay.  Who have you dealt with?

23     A.    Caty, Miguel, Roxanne, and Rose -- I can't

24  say her name.  Rosanna.

1     Q.   I think her name is Rosario -- Rosaria I

2   should say.  I apologize.

3     A.   Okay.

4     Q.   You mentioned Miguel.  That's Miguel Tawid;

5   correct?

6     A.   Correct.

7     Q.   And you have had some contact with Mr.

8   Tawid as we are going to explore?

9     A.   Right.

10     Q.   Do you recall the first time you met Mr.

11   Tawid?

12     A.   Yeah, I do.  It was when Newell did the

13   Rubbermaid acquisition of which Graco was part of.

14   And Mr. Popp and I flew out to Elverson,

15   Pennsylvania and sat down and met with a lot of the

16   customers or distributors --

17     Q.   Okay.

18     A.   -- that were there.  We did that with all

19   of the acquisitions.

20     Q.   And it's at that time you met Mr. Tawid?

21     A.   Yes.

22     Q.   Do you recall the meeting specifically?

23     A.   I remember meeting with him.  I could not

24   tell you verbatim what was talked about other than

1   our normal would just be explain to them how Newell

2   works as far as, you know, this is what we expect,

3   this is when we expect to be paid, this is what we

4   need from you, this is what you can expect from us.

5      Q.   Okay.  Do you recall when that meeting

6   occurred?

7      A.   No, I don't.

8      Q.   Okay.  Nobody seems to know.  And that was

9   an in person meeting face to face?

10      A.   Yes, it was.

11      Q.   And Mr. Popp was present as well?

12      A.   Yes, he was.

13      Q.   Did Mr. Tawid have anyone with him at the

14   time?

15      A.   I can't answer that.  I honestly don't

16   know.

17      Q.   You don't remember?  Okay, that's fine.

18   Have you met Mr. Tawid in person anytime after that

19   meeting?

20      A.   He -- when I used to -- I don't like the

21   way this sounds -- work the shows.

22           MR. BARNUM:  We'll take it in its note

23   style.

24           THE WITNESS:  Please do.  Because they

Page 43

1    weren't that much fine.

2    BY MR. GROSSMAN:

3        Q.   What kind of shows?

4        A.   It would be, you know, he and his wife and

5    other members of his team, for lack of a better

6    word, would meet and come to the booth.  We would

7    talk occasionally.  I think it was the toy show in

8    New York we were invited out to dinner quite often.

9    If any of our customers were going out to dinner I

10   would be invited along, usually with sales people.

11       Q.   Okay.  All right.  About how many times do

12   you recall being in Mr. Tawid's presence?

13       A.   Maybe three or four.

14       Q.   Okay.  I'd like to try to establish at

15   least a general time frame.

16       A.   Okay.

17       Q.   No, no, no, not the shows.

18       A.   Oh, okay.

19       Q.   Of the beginning of this first meeting.

20   Just so we can establish the length of time that

21   you've known Mr. Tawid.

22       A.   Oh, okay.

23       Q.   I'm going to -- I hate to suggest an answer

24   because Mr. Barnum may just object to it.  But I'm

Page 44

1    going to suggest it's somewhere around 1999, 2000

2    into 2001.  Does that help your recollection at all

3    as to when that first meeting occurred?

4         A.    The only way I have of putting it into

5    perspective is I believe the acquisition was 1999

6    to 2000 for Rubbermaid, which means that Graco

7    would have come along with it.

8         Q.    Okay.  So the acquisition of -- okay.

9         A.    Rubbermaid.

10        Q.    Rubbermaid, which included Graco.  Okay.

11   Now, this is something new for me.  I need to

12   explore this with you a little bit if you don't

13   mind.  Newell and Rubbermaid were not the same

14   company prior to that?

15        A.    Correct.

16        Q.    Oh, okay.  You were employed by one of them

17   at the time?

18        A.    Yes, I was.

19        Q.    Which one?

20        A.    Newell.

21        Q.    And what was the -- what was Newell's

22   business prior to its acquiring Rubbermaid?

23        A.    We had Newell Window Furnishings.

24        Q.    I'm sorry?

Page 45

1       A.    Newell Window Furnishings.

2       Q.    Window Furnishings, okay.

3       A.    And we also at that time owned Amerock

4    Hardware and Anchor Hocking.

5       Q.    Okay.

6       A.    Over the years I can't go -- I can't even

7    remember how many companies that Newell has

8    purchased.

9       Q.    Okay, that's fine.  So when I asked your

10   employment began and you told me it was in the

11   '90's, I didn't write it down.  Doesn't matter that

12   much.  That was with Newell?

13      A.    Yes, it was.

14      Q.    And it just continued on and acquired

15   Rubbermaid and we go from there?

16      A.    Um-hum.

17      Q.    Okay.  So when Rubbermaid was acquired by

18   Newell, it was already the parent company for

19   Graco; is that your understanding?

20      A.    That's my understanding.

21      Q.    Okay.  So is Newell the parent company of

22   Rubbermaid, if you know?

23      A.    You're going to have to ask the attorneys

24   how that works.

 1    Q.   Okay.  So you're not really clear?

 2    A.   I -- I know that we acquired Rubbermaid and

 3  its subsidiaries or some of its subsidiaries.

 4  Other than that, I can't tell you how it goes.

 5    Q.   I understand, okay.  Well, I don't

 6  understand, but I understand your lack of clarity

 7  is fine.  I've just been seeing the name Newell

 8  Rubbermaid as a conjunction I suppose from the very

 9  beginning.  I wasn't clear at all that it was

10  separate.  Newell began as a company approximately

11  when, if you know?  You can even estimate by

12  decade.

13    A.   I should know this.  I remember the 75th

14  anniversary, but I can't even remember what day it

15  was, so I can't tell you.

16    Q.   Okay.  So it's been a long time?

17    A.   A long time.

18    Q.   That's good enough for me.  Okay.  Let's

19  move on then.  Are you familiar with the contract

20  that Graco entered into with Flexflo?

21    A.   No, I am not.

22    Q.   Okay.  Have you ever seen it?

23    A.   No, I have not.

24    Q.   Are you familiar with the payment terms

1    that are part of those contracts?

2       A.   As part of --

3            MR. BARNUM:  Objection.  Calls for

4    speculation.  Lacks foundation.

5    BY MR. GROSSMAN:

6       Q.   I'm sorry?  Your answer, please?

7       A.   No.

8       Q.   You don't know.  Okay.  When -- to clarify

9    one point for me, when an account would come to

10   your attention for collection, if I understand your

11   testimony, it would have to be 90 days late?

12      A.   No, that's not right.

13      Q.   Okay.  That's why, if you don't mind

14   clarifying for me, when would these accounts first

15   come to your attention?

16      A.   They could come to my attention when they

17   are one day past due.

18      Q.   I see.

19      A.   But in order for it to have a final demand,

20   it would have to go 90 days past due.  That's two

21   different things.

22      Q.   Can you explain, please?

23      A.   Okay.  You don't pay your bill to Visa and

24   you are one day past due, okay?  They will know it,

1    they might not say anything to you.

2        Q.    Okay, right.

3        A.    But if you don't pay it for 90 days, they

4    are going to say something to you and probably cut

5    off your credit.

6        Q.    I see.  So your part of the collection

7    process doesn't start until that 90 days after the

8    due date?  Is that correct?

9            MR. BARNUM:  Objection.  States facts not

10   in evidence.  Misstates the witness' testimony.

11           MR. GROSSMAN:  I'm sorry.

12           MR. BARNUM:  And counsel, because she has

13   already testified, and I want to make sure that I

14   understand how she has testified, my understanding

15   is that she had two types of accounts.  Upon your

16   questioning of how accounts came to her attention,

17   she testified that she had a special maintenance

18   account that she monitors every day, and then she

19   also testified that she had accounts come to her

20   when they are 90 days past due, and those accounts

21   have been designated final demand.  So which of

22   those are you referring to?

23           MR. GROSSMAN:  I don't know actually.  Let

24   me gather my thoughts.

1    BY MR. GROSSMAN:

2        Q.   Let's talk about Flexflo.  Flexflo at some

3    point did come to your attention; correct?

4        A.   Correct.

5        Q.   Okay.  Do you have a recollection as to why

6    it came to your attention initially?

7        A.   Because they were past due.

8        Q.   Do you remember when that occurred?

9        A.   I can tell you that over the years Flexflo

10   has come to my attention many times.

11       Q.   Okay.

12       A.   For being late on payments.

13       Q.   Okay.

14       A.   For credit cards not going through.

15       Q.   Do you have a -- your best estimate as to

16   how many times?

17       A.   No, I'm sorry.  I deal with hundreds of

18   accounts sometimes and I don't keep track of who

19   does what.

20       Q.   But you recall --

21       A.   But it was somewhat chronic.

22       Q.   I'm sorry?

23       A.   It was somewhat chronic or I wouldn't

24   remember that it happened.

1    Q.   I see.  Now, we've established that the

2  relationship with Flexflo began with, at least for

3  your purposes, when Newell acquired Rubbermaid and

4  you first met Mr. Tawid, they were at that point

5  already a customer of Graco?

6    A.   Correct.

7    Q.   Okay.  Do you know -- do you have any

8  memory as to when you say they were chronically

9  late, does it go all the way back to those

10  beginning years, 2000, 2001?  Or does that -- does

11  your memory tell you that it took -- it came in

12  later at some point?

13    A.   I cannot honestly answer that because I do

14  not honestly remember.

15    Q.   Okay.  Do you know if there are records

16  that would establish late payments?

17    A.   What kind of records?

18    Q.   Records that your department might maintain

19  on the history of payments by Flexflo.

20    A.   Other than agings?

21    Q.   I don't know.  I'm asking you.

22    A.   Yeah, I don't know what kind of --

23    Q.   Well, if I wanted to establish how many

24  times Flexflo paid late and how late those payments

1   were, and if I wanted to create a complete history

2   of the Flexflo payments to Newell Rubbermaid, do

3   you know if Newell Rubbermaid maintains -- has

4   maintained those records?

5       A.   I don't know that.

6       Q.   Okay.  Do you know who would know that?

7       A.   No, I don't.

8       Q.   Okay.

9            MR. BARNUM:  And I'll interpose a belated

10  objection.  It assumes facts not in evidence that

11  such records are actually kept and maintained by

12  the company.

13           MR. GROSSMAN:  I'm not assuming anything.

14  I'm asking.

15  BY MR. GROSSMAN:

16      Q.   Ms. Quiggle, what records -- what

17  documentation -- let me go back to records.  What

18  records are created or maintained by your

19  department with regard to the collections

20  activities that you are involved in?

21      A.   There would be notes on the account.

22      Q.   Um-hum.  Okay.  And as far as paper that

23  not is necessarily created, but is available for

24  your purpose, what typical documents would you

Page 52

1    be --

2        A.    Paper?

3        Q.    Paper documents.  I'm saying things like

4    invoices and whatnot.  What types of documents do

5    you review as part -- for your work?  With anyone?

6        A.    I don't review paper.

7        Q.    Okay.  So your department doesn't maintain

8    a hard paper file --

9        A.    No.

10       Q.    -- of the customers?  Okay.  Everything you

11   would need to do your job is on a computer system?

12       A.    (Indicated in the affirmative.)

13            MR. BARNUM:  You have to give a verbal

14   answer.

15       A.    Oh, I'm sorry.  Yes.  Can't you hear it

16   shaking?

17   BY MR. GROSSMAN:

18       Q.    I heard it loud and clear.  What is that

19   system?

20       A.    SAP.

21       Q.    Okay.  I learned from Mr. Popp yesterday

22   something about the SAP system, so I don't think I

23   need to spend too much time on that.  Except to ask

24   you, the SAP system has on it what types of

Page 53

1    information that are relevant for your work?

2       A.   I can see the customer's account, the

3    invoices that are out there that are due, not due,

4    past due.  I can see payments that have been made

5    and how they were applied.  I can pull up and look

6    at an invoice or a packing list if it is available

7    POD, proof of delivery.

8       Q.   Okay.  I'm sorry, did you mention payments

9    in that?

10      A.   Yes, payments that have been made I can

11   see.

12      Q.   And that would include the date received

13   perhaps?  Or what information regarding the

14   payments is in the system?

15      A.   We have what is called a posting date.

16      Q.   Okay.

17      A.   Now, for a real clear explanation you are

18   going to have to ask somebody else that.

19      Q.   But it's a date?

20      A.   It's a date that I look at and say okay,

21   this check was posted as of this date.

22      Q.   And then the amount is available for you to

23   review as well?

24      A.   Yes.

Page 54

1     Q.   Does it tell you the type of payment?  In

2  other words, credit card, check, wire transfer?

3     A.   Yes.

4     Q.   Okay.  You accept credit cards obviously?

5     A.   Some divisions accept some, some divisions

6  accept another.  I don't know which is which.

7     Q.   For Flexflo though, you mentioned credit

8  card?

9     A.   I believe they did, yes.

10     Q.   So this SAP system, do you know if it keeps

11  the data for any period of time or permanent -- has

12  a permanent archiving system?

13     A.   I don't know that.

14     Q.   You don't know?  Okay.  Have you ever had

15  occasion to look back in the SAP system to

16  determine some historical information regarding a

17  customer?

18     A.   Yes, if I'm trying to find if there was a

19  payment or if a customer claims that they paid an

20  invoice that I don't show has been paid.

21     Q.   Okay.  Do you know who, if anybody within

22  Newell Rubbermaid, is responsible for maintaining

23  the SAP system?  And when I say maintaining it, I

24  mean you've told me that I had to ask someone else.

Page 55

1    Who would I have to ask if I wanted to learn more

2    information about this SAP system and how it works,

3    if you know?

4         A.   We have an entire computer team.  We have

5    one here in Freeport and another one in Atlanta.

6         Q.   And the team in Freeport?

7         A.   I couldn't name them if you wanted me to.

8         Q.   No, that's okay.  Does that have a specific

9    name?

10        A.   CIS.

11        Q.   I'm sorry?

12        A.   CIS.

13        Q.   CIS, okay.  And is it your understanding

14   that that department is -- has knowledge of how the

15   SAP system works?

16        A.   Well, I hope so, yes.

17        Q.   Okay.  Do you know who's the head of that

18   department?

19        A.   No, I'm sorry, I don't.

20        Q.   You don't, okay.  But there are people

21   located in Freeport?

22        A.   There are some people located in Freeport.

23        Q.   And there is others also in Atlanta?

24        A.   Yes.

Page 56

1      Q.   Does Newell Rubbermaid have any other

2    offices?

3            MR. BARNUM:  Objection.  Vague.

4    BY MR. GROSSMAN:

5      Q.   Kind of hard to say, but corporate offices.

6    Corporate type offices.  I know there is an office

7    here in Freeport and another office located in

8    Atlanta.  Do you have an understanding as to any

9    other offices maintained by Newell Rubbermaid for

10   administrative or corporate purposes?

11     A.   Where?

12     Q.   I'm asking if there are any more?

13     A.   We have other offices.  If they are

14   corporate, I don't know.

15     Q.   Well, what do you know of those other

16   offices in terms of their functions?

17     A.   Nothing, other than they exist.

18     Q.   Okay.  Where are they?

19     A.   Someplace in -- someplace in Europe.

20     Q.   Okay.  That's fine.  All right.  Now, you

21   told me that Flexflo made payments for its purchase

22   by credit card?

23     A.   On occasion.

24     Q.   On occasion.  Do you know what other method

1   of payment were made by Flexflo?

2       A.   I can honestly say I don't know for sure

3   because I never took a credit card payment or any

4   other kind of payment.

5       Q.   Okay.  So but you do know that credit card

6   payments were made?

7       A.   Yes.

8       Q.   And how do you know that?

9       A.   By reading notes.

10      Q.   Okay.  Who -- who accept -- who would be

11  responsible for accepting the credit card payments?

12  Is there a department for that or how does that

13  work?

14      A.   I know that our inbound team can take

15  credit card payments.

16      Q.   Okay.

17      A.   I can't tell you anything more than I know

18  that they do.  There could be, but I don't know.

19      Q.   And who is the -- is there a manager of the

20  inbound team?

21      A.   Manager would be Mr. Popp.

22      Q.   Mr. Popp, okay.  And how many -- how many

23  individuals are part of the inbound team currently?

24      A.   I believe there is six.  I really don't

Page 58

1  work with them.

2      Q.   Okay.

3      A.   So --

4      Q.   And you're part of the outbound team?

5      A.   Yes.

6      Q.   Okay.  You part of any other teams within

7  Newell Rubbermaid?

8      A.   I'm part of -- chief cook and bottle

9  washer, if you want to be honest.

10      Q.   You do a lot of stuff there?

11      A.   I actually would say I'm more or less a

12  clean-up person for things that don't get done.

13      Q.   Okay.  And I appreciate the comment, but

14  let's not confuse that you are not the maid and you

15  are not sweeping floors I assume?

16      A.   No, I'm not sweeping floors.

17      Q.   When you say clean-up person --

18      A.   If there are problems of a very large

19  magnitude, I will be -- sometimes be asked to help

20  straighten them out.

21      Q.   Okay.  And that request could come from

22  who?

23      A.   It usually comes from either Ms. Stenbeck

24  or Gary Popp.

1    Q.    So Mrs. Stenbeck is your supervisor?

2    A.    Right.

3    Q.    Okay.  Are there other collectors that

4  might ask for your assistance directly?

5    A.    No.

6    Q.    No?  So there is a chain of command?

7    A.    Yes.

8    Q.    And everybody sort of honors that?  So it

9  goes up to Ms. Stenbeck or Mr. Popp?

10    A.    Yes.

11    Q.    And then goes down to you?

12    A.    Right.

13    Q.    And they hand you the broom?

14    A.    There you go.

15    Q.    Okay, I get it.  When -- regarding the

16  credit card payments from Flexflo, you say you had

17  nothing to do with receiving those payments?

18    A.    That's correct.

19    Q.    Did you have any discussions with Mr. Tawid

20  of Flexflo regarding -- regarding the credit card

21  payments in any manner?

22    A.    No.

23    Q.    Okay.  Do you -- you've spoken with Mr.

24  Tawid on the phone, have you not?

1    A.    Yes, I have.

2    Q.    Do you know how many times you've talked?

3    A.    I don't.  Over many years.

4    Q.    Yes.

5    A.    No.

6    Q.    Have you talked -- have you -- we'll get to

7  that in a minute.  The telephone conversations with

8  Mr. Tawid have been going on over the years, as you

9  suggest.  So you've had many conversations with

10  him?

11    A.    A normal amount.

12    Q.    Normal, okay.  When you say normal, are you

13  comparing that with other customers?

14    A.    Yeah.

15    Q.    That you are also working on?

16    A.    Um-hum.

17    Q.    Okay.  What types of topics have you

18  discussed with Mr. Tawid over the telephone?

19    A.    When he's been asking for longer terms.

20    Q.    Okay.

21    A.    When he's trying to explain the government

22  workings of Venezuela.

23    Q.    Okay.

24    A.    When, you know, he came to me when he found

Page 61

1   out that his distributorship was being terminated,

2   whatever you call it.

3       Q.   Okay.

4       A.   Oh.  He occasionally would call and

5   sometimes just to say hello or to find out how I

6   was after an accident.

7       Q.   You had an accident?  Is that what you are

8   referring to?

9       A.   (Indicated in the affirmative.)

10      Q.   When was that?

11      A.   December 21, 2011.

12      Q.   Okay.  I hope it wasn't serious.

13      A.   You want to see how serious it was?

14  (Witness pulled back her shirt sleeve.)

15      Q.   Ouch.

16      A.   And it goes all the way up.  Yeah, it was

17  serious.

18      Q.   So Mr. Tawid called to see how you were

19  doing?

20      A.   Just to wish me well.  A lot of customers

21  did.

22      Q.   Okay.  Well, that's nice.  So did you ever

23  have -- other than the well wishes from your

24  accident, did you and Mr. Tawid ever talk about

Page 62

1    personal matters?

2         A.    Oh, he informed me that he was getting a

3    divorce.

4         Q.    Okay.

5         A.    And occasionally he would mention something

6    about his -- one of his kids or two of his kids or

7    something in soccer.

8         Q.    Okay.

9         A.    That was -- again, that's not out of the

10   norm for customers.

11        Q.    Why do you say that?

12        A.    Well, after you talk to customers for years

13   and years and years they sometimes, you know, just

14   will tell you different things.

15        Q.    Did you talk to him about any of your

16   personal life?

17        A.    No.

18        Q.    Other than your accident?

19        A.    Just my accident.

20        Q.    I understand you have some involvement in

21   local politics; is that correct?

22        A.    I used to.

23        Q.    You used to?  What was that about?

24        A.    I was a county board member.

Page 63

1    Q.   And that was an elected office?

2    A.   Yes.

3    Q.   And you had a campaign --

4    A.   Yes, I did.

5    Q.   Okay.  You talked to Mr. Tawid about that?

6    A.   Actually you're right, I did.  And he did

7    offer that he could help.  And I did not take him

8    up on that.

9    Q.   Was he specific in his offer or --

10   A.   I am going to tell you that I sometimes

11   have a hard time understanding Mr. Tawid.

12   Q.   Okay.  English is not his first language?

13   A.   No, it's not.  And he was talking something

14   about website or something, of which I do not have

15   and did not want to get into.

16   Q.   Okay.  So you ran for elected office and

17   you won?

18   A.   (Witness indicated in the affirmative.)

19   Q.   Did you do that more than once?

20   A.   Yeah, I did.  Last time I lost.

21   Q.   Oh, I'm sorry to hear that.

22   A.   I'm not.

23   Q.   Okay.  The position you were elected to you

24   said is what?

Page 64

1      A.    Was county board representative for

2   District D.

3      Q.    Okay.  And the county board is the

4   governing body that --

5      A.    Governs Stephenson County.

6      Q.    For Stephenson County, okay.  When you

7   spoke with Mr. Tawid by telephone, did you make

8   notes of those conversations?

9      A.    Probably not, depending on, you know, if he

10  had said I'm sending a check, then I would have

11  probably made a note of how much.

12     Q.    Okay.

13     A.    But to be real honest, it was usually one

14  of the girls that would say they were sending a

15  check.

16     Q.    Oh, you mean from Mr. Tawid's employees?

17     A.    Yeah.

18     Q.    So Mr. Tawid himself didn't necessarily

19  tell you?

20     A.    No.

21     Q.    He had other people handle that part of it?

22  Is that also true about credit card payments?

23     A.    I cannot answer that, I never took one.

24     Q.    Do you recall him ever telling you that he

Page 65

1   was going to make sure that you got paid by credit

2   card?

3        A.    No, I don't.

4        Q.    Okay.  You mentioned that he was talking to

5   you about the termination of the distributorship

6   relationship.  What do you recall about those

7   conversations?

8        A.    He called and said that, you know, he had

9   been told that he was no longer going to be a

10  distributor, which he then followed up with an

11  e-mail.

12       Q.    Okay.

13       A.    And I knew nothing about it other than

14  before he brought it up to me.

15       Q.    So the first time you --

16       A.    I heard it from him.

17       Q.    Okay.  Let me ask the question.

18       A.    Sorry.

19       Q.    That's okay.  I appreciate you wanting to

20  be cooperative and helpful.  But the question is,

21  the first time you had any knowledge of the

22  termination of the distribution agreement that

23  existed between Graco and Flexflo was when Mr.

24  Tawid called you to discuss it with you?

Page 66

1      A.    To inform me of it.

2      Q.    To inform you, I'm sorry.  Thank you for

3    that clarification.  What do you recall, if you can

4    think back, did he specifically tell you regarding

5    the termination?

6      A.    He was, as I recall, I think he wanted to

7    know if I knew anything about it, which I did not.

8    But other than that, I don't -- I just told him to

9    send, you know, what he had to us, which he did, in

10   the form of an e-mail.

11     Q.    And you received the e-mail.  Do you recall

12   what was the content of that e-mail?

13     A.    Pretty much just telling us that, you know,

14   he had -- his distributorship was going to be

15   revoked, okay.  And at that time, you know, what

16   was happening.  And sent us what he had received.

17          MR. GROSSMAN:  Okay.  You know what?  Why

18   don't we take a little break?

19          MR. BARNUM:  Sounds good.

20            (WHEREUPON, a short recess was taken.)

21          (Quiggle Exhibit No. 1 was marked for

22            identification by Mr. Grossman.)

23   BY MR. GROSSMAN:

24     Q.    Ms. Quiggle, I've handed you what's been

Page 67

1    marked as Exhibit 1 for today's deposition, and ask

2    if you can take a minute to review this document.

3    My question will be to you if you recall seeing it

4    before?

5        A.   Yes, I do remember seeing it before.

6        Q.   Okay.  The date of the document is

7    March 29, 2011.  Do you recall if that's the date

8    you first saw it?

9        A.   I cannot tell you the exact date, but I

10   would -- I can't tell you the exact date.

11       Q.   Okay.  Was it approximately that date?

12       A.   It would be approximately that date, yeah.

13       Q.   On or about March 29th?

14       A.   Yeah.

15       Q.   Okay.  And this letter is from Mr. Tawid of

16   Flexflo; correct?

17       A.   Yes.

18       Q.   And it's directed to you.  Before you

19   received it did you know a letter such as this

20   would be coming from Mr. Tawid?

21       A.   No.

22       Q.   You didn't -- he didn't mention that he was

23   sending you a letter?

24       A.   No.

Page 68

1      Q.   Now, is this a letter that was mailed or

2   sent to you by e-mail?

3      A.   E-mail.

4      Q.   It was an e-mail okay.  And when you

5   received the letter did you read it?

6      A.   I did read it.

7      Q.   Okay.  And did you -- what do you recall

8   doing as a result of reading this letter, if

9   anything?

10     A.   I sent it on to Mr. Popp.

11     Q.   That's it?

12     A.   Yeah.  It's not in my realm of what I can

13  do.

14     Q.   Okay.  Did you discuss the content of this

15  letter with Mr. Tawid at any time?

16     A.   I don't believe so.

17     Q.   Okay.  The discussion in the letter

18  involves the Venezuelan government and things about

19  money flowing from Venezuela.  Is that a topic of

20  conversation that you engaged in with Mr. Tawid?

21     A.   I would say yes.

22     Q.   Okay.  Do you recall whether that topic was

23  discussed by telephone or by e-mail or both?

24     A.   I know by e-mail.

Page 69

1    Q.   Okay.

2    A.   For sure.  I can't tell you for sure that I

3  talked on the phone about this.

4    Q.   You don't recall whether you did or not?

5  Okay.  What is your understanding of the situation

6  in Venezuela that is discussed by this letter?

7         MR. BARNUM:  Objection.  Relevancy.  Go

8  ahead.

9  BY MR. GROSSMAN:

10   Q.   If you have any independent understanding

11 to your knowledge?

12        MR. BARNUM:  I also object to the document.

13 It's not authenticated.  Go ahead.

14   A.   I'm sorry.  Clarify please.

15 BY MR. GROSSMAN:

16   Q.   Okay.  When you read this letter you see

17 there is a discussion here about various currency

18 situations in Venezuela?

19   A.   Yes.

20   Q.   Do you have any independent knowledge

21 regarding the currency policies or laws in

22 Venezuela as they affect international trade?

23   A.   No.

24   Q.   You don't?

Page 70

1    A.    Laws and -- no.

2    Q.    Now, in this letter on the very top of the

3    second page Mr. Tawid writes, "What we need is a

4    maximum of 180 days of credit as a time limit for

5    payment."  Then he goes on to say, "so through the

6    payments that we receive each month we can transfer

7    to you all our obligations acquired."  Do you know

8    what he is suggesting there?

9    A.    It would be speculation on my part, and it

10   was not within my realm of authority.

11   Q.    Okay.  So you read this and said I have to

12   pass it on, and you passed it on to Mr. Popp?

13   A.    Yep.

14   Q.    Okay.  So you wouldn't have any authority

15   then to grant an extension of -- yeah, an extension

16   of the credit time limit as was mentioned by this

17   letter?

18   A.    That is correct.

19   Q.    You don't have that authority?

20   A.    I do not have that authority.

21   Q.    Do you know if Mr. Popp does?

22   A.    You would actually have to ask him.

23   Q.    Yeah, I did.

24        MR. BARNUM:   And he answered.

1           MR. GROSSMAN:  Yes, he did.

2    BY MR. GROSSMAN:

3        Q.   Do you recall in March of 2011 if Flexflo

4    was late on payments of any of the invoices that

5    had been issued by Newell Rubbermaid?

6        A.   No, I cannot tell you that.

7        Q.   I want to review a topic that you briefly

8    mentioned earlier, and that was the termination of

9    the distribution agreement.  And if I recall, your

10   comments about that topic was one of the things

11   that you and Mr. Tawid discussed by telephone.

12       A.   Um-hum.

13       Q.   Okay.  And you said you didn't know

14   anything about that?

15       A.   No, I didn't.

16       Q.   Prior to hearing --

17       A.   I heard it from him.

18       Q.   So just to make sure for the record, that

19   in the decision to terminate the distribution

20   agreement, you were not consulted in any way?

21       A.   No, I was not.

22       Q.   There was no communication with you --

23       A.   No, sir.

24       Q.   -- whatsoever?

1           MR. GROSSMAN:  You know what?  I meant to

2     ask if I can borrow a stapler because a whole lot

3     of my stuff is not stapled.

4           (Quiggle Exhibit No. 2 was marked for

5               identification by Mr. Grossman.)

6     BY MR. GROSSMAN:

7        Q.   Ms. Quiggle, I've handed you what's been

8     marked as Exhibit 2 for today's deposition.  And

9     ask you to -- these are two e-mails.  One is dated

10    April 29, 2011, which is the bottom one from Ms.

11    Pfeiffer to Mr. Tawid.  And you are --

12       A.   Copied.

13       Q.   -- you are copied, as are Mr. Sandberg, Mr.

14    Popp and Mr. Newcomer.  And then the second -- the

15    top half is an e-mail from Mr. Tawid back to Ms.

16    Pfeiffer, copied to those same individuals.  Have

17    you seen either of these e-mails before?  And if

18    so, which one or both?

19       A.   I believe I saw both of them.

20       Q.   Okay.  The e-mail from Ms. Pfeiffer said

21    that they reviewed his request for 180 days

22    extension and they could not accommodate it.  Did

23    anyone from Ms. Pfeiffer's department discuss the

24    extent -- the requested extension with you?

Page 73

1      A.    No.

2      Q.    That decision was made outside of your

3  department?

4      A.    Yes, sir.

5      Q.    Unfortunately, the copy is really bad of

6  Mr. Tawid's e-mail.  I have attempted to read it.

7            MR. BARNUM:  I have a slightly better copy,

8  Counsel.

9            MR. GROSSMAN:  Okay, that would be great.

10           MR. BARNUM:  But my copy's only of the

11 first page of the exhibit.

12           MR. GROSSMAN:  I'll tell you what we can

13 do.  Simply I'll read it in the record so we know

14 what it says for later, and then we can share this

15 if we need to.

16 BY MR. GROSSMAN:

17     Q.    So Mr. Tawid on May 2, 2011 at 10:18 a.m.

18 sent by e-mail the following message to Susan

19 Pfeiffer, copied to Rob Sandberg, Gary Popp, Ray

20 Newcomer and Beckey Quiggle.  And the subject is

21 regarding Flexflo USA, Inc. account number 1 -- I'm

22 sorry, correct that -- 57149.  Before I read the

23 content of the e-mail, Ms. Quiggle, the account

24 number referenced there, do you recognize that

1   number?

2        A.    No.

3        Q.    Okay.  You don't know what that reference

4   is?

5        A.    I know that it's an account number.

6   Probably his.  I see thousands of these.

7        Q.    Okay.  When you say his, you're talking

8   about Flexflo USA?

9        A.    I mean Flexflo's, yes.

10       Q.    And Flexflo has just one account number; is

11  that accurate?

12       A.    I don't know that for sure.

13       Q.    You don't know for sure?  Okay.  It could

14  have more than one?

15       A.    It could.

16       Q.    Okay.  Why would an account have more than

17  one, do you know?

18       A.    We have accounts that are dot coms, they

19  have -- they sell on.

20       Q.    Oh.

21       A.    Okay.  So we would split that out.  We have

22  some that are doing direct imports.  They may have

23  a separate account that we'd would only have the

24  direct imports, plus they buy.

1    Q.   Okay.  So let me read the content of this

2  for the record.  And then as we need to, we can

3  review it.  It says, "Dear Sue, thanks for your

4  response.  The reason of my request is not to keep

5  it longer and not even looking to change my current

6  terms, as I explain on the letter we are facing a

7  situation and as same as with GM project a couple

8  of years ago I need extra help for some time until

9  we fix the problem opening the new companies to get

10  more --" and there is a dollar sign there.  "-- and

11  maintain your company as it is and then get back to

12  our current terms.  Regards, Miguel Tawid, Flexflo,

13  USA."  Phone numbers and a website.

14         MR. BARNUM:  One correction, Counsel.

15         MR. GROSSMAN:  Sure.

16         MR. BARNUM:  At the end of the last line --

17  no, the third line, I'm sorry.  It's dollar sign

18  and maintain our.

19         MR. GROSSMAN:  Oh, I'm sorry.  Did I say

20  your?

21         MR. BARNUM:  Yes.

22         MR. GROSSMAN:  Okay.  I stand corrected.

23  And you're right, Mr. Barnum, that is "maintain our

24  company as it is."

1          MR. BARNUM:  And Counsel, if you want, we

2     can substitute out this page for the first page of

3     your exhibit since it's a little easier to read.

4          MR. GROSSMAN:  Sure.

5          MR. BARNUM:  I've got enough copies if you

6     want to just -- or we can leave it the way it is.

7          MR. GROSSMAN:  Why don't we -- I'm just

8     going to staple this page to the back because it's

9     been marked.

10         MR. BARNUM:  That's fine.  Yeah, that's

11    fine.

12         MR. GROSSMAN:  And that way we can, if we

13    need to later, read it later properly.  Okay.  So

14    you can read that cleaner copy.

15         Mr. Barnum, do you have a clean copy?

16         MR. BARNUM:  I do.

17         MR. GROSSMAN:  Okay.  And I have a clean

18    copy.  We are all good.

19    BY MR. GROSSMAN:

20      Q.   So, did you discuss this e-mail with Ms.

21    Pfeiffer?

22      A.   No.

23      Q.   Did you discuss this e-mail with anybody?

24      A.   No.

1    Q.   Okay.  Do you know the reference there

2  where he says, "we are facing a situation and as

3  same as with GM project a couple of years ago"?

4    A.   Yes.

5    Q.   Do you know what that reference is?

6    A.   Yes.

7    Q.   What is that?

8    A.   It was a project that Newell and Flexflo

9  entered into with General Motors putting car seats

10 into new cars.

11        MR. GROSSMAN:  Can you read back that

12 answer?

13        (The requested portion of the transcript

14 was read.)

15 BY MR. GROSSMAN:

16   Q.   What, if any, was Flexflo's involvement

17 with that project?

18   A.   I -- they were the distributor.

19   Q.   Okay.  And do you know that for what area?

20   A.   Venezuela.

21   Q.   Venezuela, okay.  Did you discuss this

22 project with Mr. Tawid?

23        MR. BARNUM:  Objection.  Vague.  You mean

24 as of the time of this e-mail or after?

Page 78

1          MR. GROSSMAN:  No, at any time.

2     A.   I don't believe I did.  I believe it was

3  something that just came to us from a little higher

4  up.

5  BY MR. GROSSMAN:

6     Q.   Higher up?  What do you mean by that?

7     A.   Well, sales people, VP's.  They would have

8  discussed it with Gary.

9     Q.   Okay.

10     A.   And pretty much this is what we are going

11  to do.  And that's what happened.

12     Q.   Okay.  As far as Mr. Tawid and your

13  communication, he didn't discuss this thing -- this

14  GM project with you?

15     A.   There would have been nothing that I would

16  have been involved with other than making sure it

17  got paid.

18     Q.   When he writes that "we are facing a

19  situation same as GM project," do you know what

20  situation he is referring to?

21     A.   We, I believe, had to make sure that we

22  definitely supplied on a certain schedule.  And

23  again, GM -- it was going to probably be a -- and

24  this is speculation, which I'm not supposed to do.

Page  79

 1          MR. BARNUM:  No, I don't want you to

 2  speculate.

 3          THE WITNESS:  Can't do that.

 4  BY MR. GROSSMAN:

 5     Q.   Okay.  But when he says a situation same as

 6  GM, so there is another situation that if I'm

 7  reading this correctly, that he is referencing

 8  here.  Do you know what that reference is?

 9     A.   That --

10          MR. BARNUM:  Objection.  Calls for

11  speculation.

12          MR. GROSSMAN:  I asked her if she knew.

13     A.   I don't.

14  BY MR. GROSSMAN:

15     Q.   Okay.  When he wrote to Ms. Pfeiffer in

16  this e-mail that "I need extra help for some time

17  until we fix the problem opening the new companies

18  to get more dollar sign."  And you can please look.

19  It's probably easier to review it.  Do you have any

20  knowledge as to what new companies he is referring

21  to there?

22     A.   No, I don't.

23     Q.   Okay.  You look a little uncertain as to

24  what that is.

Page 80

1     A.    I --

2              MR. BARNUM:  That's not a question.

3              MR. GROSSMAN:  No, it's not.  Okay.

4          (Quiggle Exhibit No. 3 was marked for

5              identification by Mr. Grossman.)

6              MR. GROSSMAN:  Again, unfortunately we are

7     going to be reviewing e-mails so we will do our

8     best to speed through the process a little bit.

9     Mr. Barnum, I'm going to do some shortcutting here

10    just to make this faster, so I will refer to dates

11    and things.

12             MR. BARNUM:  Sure.

13             MR. GROSSMAN:  If there is any issues or

14    questions, feel free to jump in.

15             MR. BARNUM:  If I have any concern that is

16    unclear, you know I'll speak up.

17             MR. GROSSMAN:  You are not shy.

18             MR. BARNUM:  No.

19    BY MR. GROSSMAN:

20    Q.    Okay.  So we are looking at e-mails on

21    Exhibit 3, Ms. Quiggle; correct?

22    A.    Correct.

23    Q.    Okay.  And those e-mails are dated -- I

24    guess -- I'm looking at two.  October 17th.  They

Page 81

1    are both that day, only three minutes apart.  Do

2    you recall -- and this is -- okay.  From the --

3    okay, from the Legal Affairs.  It's from a

4    paralegal Ms. Grobes, G-R-O-B-E-S, to Mr. Tawid.

5    And it's attaching a letter which is here.  This

6    is -- the letter is going to be Exhibit 4.

7            (Quiggle Exhibit No. 4 was marked for

8             identification by Mr. Grossman.)

9    BY MR. GROSSMAN:

10       Q.   And then -- so that letter, Exhibit 4, was

11   submitted by e-mail from Ms. Grobes on behalf of

12   Mr. Beckstrom, Vice President of Legal Affairs,

13   Newell Rubbermaid to Mr. Tawid.  And then three

14   minutes later he forwards -- he sends you an

15   e-mail which has a title -- the subject, rather,

16   ceasing sales.  It's a forward.  It says, "Hello

17   Beckey.  I just received this letter.  Please read

18   it and give me your comments."  Do you recall

19   receiving this e-mail and the letter?

20       A.   I recall seeing this.

21       Q.   And as you testified earlier, this would be

22   your first knowledge of the termination of the

23   distributorship relationship?

24       A.   Actually, yes.

Page 82

1      Q.   Okay.  Did you look at it when it was sent

2   to you the afternoon of October 17th?

3      A.   Yes.

4      Q.   Okay.  And he asked, Mr. Tawid does, that

5   you read the letter and provide your comments.  Did

6   you provide comments to Mr. Tawid?

7      A.   Probably not.

8      Q.   Probably not?

9      A.   Probably not.

10     Q.   Okay.  Did you have any response to Mr.

11  Tawid at all?

12     A.   I did ask him to see a letter or for him to

13  put in letter e-mail, okay --

14     Q.   Uh-huh, yes.

15     A.   -- stating what was going on so I could

16  have a hard copy.  Because Mr. Tawid is sometimes

17  very difficult to understand.

18     Q.   You said that, yes.  Okay.

19     A.   So, you know, I would ask for things in

20  hard copy or in readable e-mails.

21     Q.   Okay.  So you -- that -- you recall doing

22  that in follow-up to receiving the e-mail and the

23  letter?

24     A.   Right.  I believe this precipitated in

Page 83

1    another e-mail.

2              MR. GROSSMAN:  Okay.  Let's see if we

3    can -- actually from yesterday I think you said you

4    had the exhibits.

5              MR. BARNUM:  Off the record for a minute,

6    Counsel.

7              (Discussion held off the record.)

8              MR. BARNUM:  I spoke with my client off the

9    record and there is a point of clarification she

10   needs to make.

11             MR. GROSSMAN:  Go ahead, please.

12             THE WITNESS:  Yes.  There was a phone call

13   previous to receiving this.

14             MR. GROSSMAN:  Okay.

15             THE WITNESS:  Stating about ceasing of

16   sales from Mr. Tawid.

17   BY MR. GROSSMAN:

18        Q.   Right.  Okay.  So you have a recollection

19   of that phone call?

20        A.   Yes, he called to tell us that, you know,

21   his distributorship was being revoked.

22        Q.   Okay.

23        A.   And that's when I had asked that I need

24   something, I need to see something.

Page 84

1    Q.   So do you know if that -- what you received

2  in response -- just let me finish the question --

3  in response to saying I needed something to Mr.

4  Tawid is reflected on --

5    A.   I would have gotten this and I would have

6  gotten another e-mail.

7    Q.   Okay, let's refer to it by exhibit number

8  so we can be clear on the record.

9    A.   Okay.  Exhibit No. 4.

10   Q.   You received that from Mr. Tawid?

11   A.   No, I'm sorry.

12   Q.   Well, 3 is the e-mail.

13   A.   3 is the e-mail where he just received that

14  letter.

15   Q.   Which is Exhibit 4?

16   A.   Right, which is Exhibit 4.

17   Q.   And do you recall when that phone call was

18  made by Mr. Tawid?

19   A.   No, I'm sorry, I do not.

20   Q.   Okay.  I'm going to work a little bit if

21  you don't mind to try to refresh your recollection

22  on that.  Is there any -- is it likely that it was

23  the same day as the e-mail that was sent to you?

24   A.   If it was not the same day, it would have

Page 85

1    been the day before.

2        Q.    Okay.  So it's fairly close in time?

3        A.    Yes.

4        Q.    Okay.  All right.  So you asked him, Mr.

5    Tawid, for more clarification; is that -- I'm

6    trying to characterize your testimony, so if I'm

7    incorrect, please let me know, in response -- when

8    you received that?

9        A.    I needed to know exactly what he was

10   looking at, what his understanding was, and what

11   was happening, because I knew nothing about this.

12       Q.    Okay.  And you communicated that --

13       A.    To Mr. --

14       Q.    -- to Mr. Tawid?  Yes?

15       A.    Yes.

16       Q.    How much time passed after you received

17   that letter?

18       A.    After I received this letter?

19       Q.    The e-mail and the letter, yes.  Exhibits 3

20   and 4.

21            MR. BARNUM:  Objection.  Misstates her

22   testimony.  I believe she said that -- and I don't

23   want to testify for the witness, but I want to make

24   sure my understanding is accurate.  I believe her

Page 86

1    testimony is that in a phone call with Mr. Tawid

2    when he informed her of the distribution agreement

3    being terminated, she asked him to send her

4    something to clarify what he was saying, what he

5    was communicating to her, because it was the first

6    that she had heard that.

7    BY MR. GROSSMAN:

8        Q.   I understand.  Okay.  And then he sent you

9    Exhibits 3 and 4?

10       A.   That is correct.

11            MR. GROSSMAN:  Okay.  I understand now.

12   Thank you.  I was a little confused myself.

13            (Quiggle Exhibit No. 5 was marked for

14             identification by Mr. Grossman.)

15   BY MR. GROSSMAN;

16       Q.   Ms. Quiggle, Exhibit 5 --

17       A.   I need something more -- oh, is this two?

18   I'm sorry.  I'm so sorry.

19       Q.   Were you going to say something?

20       A.   No, I didn't think I had two.

21       Q.   Okay.  Exhibit 5 is another e-mail.  This

22   comes on December 1, 2011.  It's directed from you

23   to Mr. Tawid.  The subject is letter/e-mail.  And

24   do you recall sending that e-mail to Mr. Tawid?

1       A.    Yes.

2       Q.    Okay.  And you apologized for not getting

3   back to him sooner?

4       A.    He had left several messages.

5       Q.    By phone?

6       A.    (Indicated in the affirmative.)

7       Q.    Okay.  Do you know the nature of the phone

8   call that he -- did he leave a detailed message?

9       A.    No, just would I please call him back?

10      Q.    Okay.  And this was your response to those

11  phone calls?

12      A.    Yes, it is.

13      Q.    Did you have any telephone calls between

14  the time that Exhibits 3 and 4 were submitted to

15  you in October and this December 1st e-mail?

16      A.    I believe we did where I had asked him to

17  please send me an e-mail stating some things that

18  he had said in a conversation about his intentions

19  to pay or not pay.

20      Q.    Okay.  And what was that conversation?

21  What did Mr. Tawid say about his intention to pay

22  or not pay?

23      A.    He said that he was very upset about the

24  ceasing of sales, and that he did not have

Page 88

1    intentions of paying his bill until he had -- until

2    there was, I said a resolution, and he said the

3    issue had been cleared, I believe.

4        Q.   Okay.  You write in this e-mail that "I

5    think you may have --"  Okay, I'm going to read it.

6    Give me one moment.  Okay.  What you write is this.

7    "I think you may have done this before, but would

8    you please send me an e-mail just briefly stating

9    your position and that while you have every

10   intention of paying your bill you are waiting to

11   hear back from Newell Rubbermaid about continuing

12   to work with Graco"?

13       A.   Right.

14       Q.   So that was a follow-up to phone

15   conversations you had with Mr. Tawid?

16       A.   A phone conversation, yes.

17       Q.   Just one?

18       A.   As far as I know, yes.

19       Q.   Okay.  Did you speak with him -- do you

20   recall how long that conversation lasted?

21       A.   No, I'm sorry, I don't.

22       Q.   So, when you wrote this to Mr. Tawid, do

23   you have an understanding as to whether he had the

24   intention of paying the bills?

Page 89

1    A.   I believe he said that he did have every

2  intention of paying his bill, however the question

3  was when.

4    Q.   Okay.  I understand.  Did you answer that

5  question?

6    A.   No.

7         MR. BARNUM:  Objection.  Lacks foundation

8  and mischaracterizes the witness' testimony.

9  BY MR. GROSSMAN:

10   Q.   Okay.  Maybe I misunderstood your

11 testimony.  You said the question was when.  Who's

12 question is that?

13   A.   That was my -- I mean I didn't verbalize

14 it.

15   Q.   Okay, I understand.

16   A.   That was my question.  When will I get

17 paid?

18   Q.   Sure.  You didn't verbalize it to Mr.

19 Tawid?

20   A.   Right.

21   Q.   Did the topic of timing of payment of

22 invoices come up in any telephone conversation you

23 had with Mr. Tawid?

24   A.   Only from the e-mail that he had said and

1    from here that he had no intentions of paying until

2    he had a resolution.

3                    MR. GROSSMAN:  I see.

4              (Quiggle Exhibit No. 6 was marked for

5                   identification by Mr. Grossman.)

6    BY MR. GROSSMAN:

7         Q.   Exhibit No. 6 is the e-mail of December 2,

8    a second -- I shouldn't say a second.  But another

9    e-mail from Mr. Tawid to you, Ms. Quiggle.  And

10   categories are Graco case.  And do you recall this

11   e-mail?

12        A.   Yes.

13        Q.   Okay.  In the second paragraph of this

14   e-mail he writes, "Also you noted that we defer the

15   payments from our side until we end this situation

16   and we are back to normal."  And he goes on to say

17   more things.  Did you have a discussion with Mr.

18   Tawid regarding deferring the payments from his

19   side?

20        A.   Where he told me he was not going to make

21   the payments until the issue had been --

22        Q.   Same?  Was that the same discussion?

23        A.   Same discussion.

24        Q.   Do you know if you talked to Mr. Tawid

Page 91

1    between your e-mail on the 1st, which was at

2    8:30 in the morning on Thursday, and his e-mail at

3    2 o'clock the Friday?  The next day?

4        A.   I don't believe I did.

5        Q.   Okay.  Then at the last paragraph he

6    asks -- he says, "Please reply to me ASAP to

7    continue and get back to our relations."  Did you

8    reply to him ASAP as requested?

9        A.   I don't think I did.

10       Q.   You don't think you did?

11       A.   No.

12       Q.   This would be a Friday afternoon?

13       A.   I'm pretty sure I wouldn't have.

14       Q.   Okay.  He asked for a detailed business

15   evaluation.  Do you know what he was asking for?

16       A.   Not really.  I know that he explained he

17   needed all of his sales for over a period of years.

18       Q.   Okay.

19       A.   And then he also brought up another

20   customer, Medex.

21       Q.   Right.

22       A.   There is no way we would ever give out

23   another customer's information.

24       Q.   Okay.

Page 92

1      A.    That was something that you learned very

2   early.

3      Q.    Okay.

4      A.    Secondly, I really don't have the ability

5   to get those figures.  That would have to come from

6   I believe his sales people.

7      Q.    His sales people?

8      A.    Yeah.

9      Q.    Not Flexflo's?

10     A.    Well, no, I'm sorry.  Newell Rubbermaid

11  Graco's sales person that sold product to Flexflo.

12     Q.    I see.  So that's not your department?

13     A.    That's not my department.

14     Q.    Did you -- you mentioned Medex and all

15  this.  Is this part of -- does this come from

16  telephone conversations with Mr. Tawid?

17     A.    No, it was an e-mail.

18     Q.    Regarding Medex?

19     A.    Yeah, he put it in an e-mail.

20     Q.    Oh, okay.  Before or after this e-mail?

21     A.    I believe it was after this e-mail.

22     Q.    It was after?

23     A.    Yes, I believe it was.

24     Q.    So at the time you received this e-mail

Page 93

1  when he mentioned detailed business evaluations

2  from both sides, did you have an understanding what

3  he was referring to there?

4      A.   Not really.  I did not think he was asking

5  me for anything.

6      Q.   Okay.  So it's not -- in your view of this

7  content, you are not being asked to do anything?

8      A.   Right.

9      Q.   Okay.  All right.  Other than to reply

10  ASAP?

11      A.   Yeah.

12          (Quiggle Exhibit No. 7 was marked for

13           identification by Mr. Grossman.)

14  BY MR. GROSSMAN:

15      Q.   Okay.  Exhibit 7.  Now, this is an

16  e-mail -- actually it's a --

17      A.   It's the same thing, isn't it?

18      Q.   It's the same thing except that it has Gary

19  Popp where you apparently looks like you forwarded

20  this e-mail to Mr. Popp?

21      A.   That's exactly what I would have done.

22      Q.   Okay.  Now, that would have been done by

23  the clock 15 minutes after you received it, just to

24  be clear, because of the time change from Central

1  to Eastern time.  The e-mail was received at

2  2 p.m. -- sent at 2 p.m. Eastern time, which is

3  reflected as 1 p.m. on Exhibit 7.  You see that?

4      A.   Yes, I do see that.

5      Q.   And then 15 minutes later you forwarded it

6  then to Mr. Popp; is that correct?

7      A.   No, I don't think so.  Because if he was

8  sending this on Eastern time at 1:00, it would have

9  only been 12:00 my time.  This looks like it's an

10  hour and 15 minutes later.

11      Q.   Yeah, it does, but it's not.  I mean it

12  appears not because if you look at Exhibit 6, the

13  time is 2:00 p.m.

14      A.   2:00, okay.

15      Q.   Which is the Eastern sent.  So -- I'm no

16  expert on e-mails, but I understand they time stamp

17  them from the sender time.

18      A.   Well, this is sent at 1:00 o'clock.

19      Q.   Your time?

20      A.   From Miguel.

21      Q.   It's very interesting that it has the same

22  e-mail.  Unless it was sent again.

23          MR. BARNUM:  I can offer some

24  clarification.

1          MR. GROSSMAN:  Okay, please do.

2          MR. BARNUM:  Okay.  My understanding of the

3    way Outlook works, is that depending on who is

4    printing the e-mail or depending on whose screen

5    you are looking at, the Microsoft Outlook Program

6    automatically changes the time to the location of

7    the computer where the e-mail is either being

8    viewed or printed.  So in Exhibit 6, because this

9    is viewed on Mr. Tawid's computer and printed by

10   Mr. Tawid, it shows 2:00 p.m., which is Eastern

11   time.  On Exhibit 7, page two of Exhibit 7 at the

12   bottom portion, because it's being viewed on Gary

13   Popp's computer, the program automatically converts

14   the time of Mr. Tawid's e-mail to Central time, and

15   it will reflect Ms. Quiggle's e-mail as Central

16   time.  That's my understanding of how Outlook

17   works, which is why there may be some confusion.

18   BY MR. GROSSMAN:

19      Q.   Okay.  That sounds fair to me.  Would you

20   agree with that?

21      A.   I would agree with that.

22      Q.   You got that?  Okay.  So 15 minutes passes

23   by and you forward it to Mr. Popp.  Do you recall

24   discussing the e-mail with Mr. Popp?

1      A.   No, actually I don't recall.

2      Q.   You don't recall or you didn't?

3      A.   I don't recall that we talked about it.

4      Q.   Okay.  Would you have -- to help refresh

5    your recollection, is -- are you in the practice of

6    simply forwarding e-mails?

7      A.   Yep.

8      Q.   You are?  Without discussions with

9    Mr. Popp?

10     A.   I get chewed out for that many times, yes.

11     Q.   Okay.  And do you have a recollection at

12   all as to why you forwarded Mr. Tawid's e-mail to

13   Mr. Popp?

14     A.   Well, for one thing, I needed him to know

15   that when he said he wasn't going to pay, that Mr.

16   Popp would need to know that this could possibly

17   become a bad debt, and he handles the bad debts.

18     Q.   As of this time was it a bad debt?

19   December of 2011?

20     A.   No, not at this time.

21          MR. GROSSMAN:  Not at that time, okay.  I

22   understand.

23          (Quiggle Exhibit No. 8 was marked for

24             identification by Mr. Grossman.)

1   BY MR. GROSSMAN:

2       Q.   Exhibit 8 is another e-mail, a short one on

3   the 14th.  Now, with a period of about 12 days has

4   passed.  And in this e-mail Mr. Tawid is asking of

5   you to have a conference call regarding the last

6   conference with Camilo in Miami.  So let me ask you

7   a couple questions about this e-mail.  The

8   reference to Camilo, do you know who Camilo is?

9       A.   No, I don't.

10      Q.   You have no idea?

11      A.   I have no idea.

12      Q.   Okay.  He asked for a conference call with

13  you, it appears.  It says, "I would like to have a

14  conference call with you."  Did you respond to that

15  request?

16      A.   No, I did not.

17      Q.   Did you speak with Mr. Tawid at all

18  about --

19      A.   Not after that.

20      Q.   Not after that?

21      A.   Well, not -- yeah, not --

22      Q.   In response to this e-mail you are saying?

23      A.   In response to that e-mail.

24      Q.   In the 12 days that transpired between

Page 98

1    December 2nd and December 14th, do you recall

2    having any telephone conversations with Mr. Tawid?

3        A.   No, I really don't.

4             (Quiggle Exhibit No. 9 was marked for

5                identification by Mr. Grossman.)

6    BY MR. GROSSMAN:

7        Q.   Exhibit 9 is two e-mails.  Now we are into

8    March.  So a couple months go by.  From you to Mr.

9    Tawid you give it says home, 815-801-2731.  Is that

10   your home number?

11       A.   Yes, it is.

12       Q.   And you say anytime after 7 p.m.  Does that

13   mean --

14       A.   My name.

15       Q.   Your time.  Does that mean Mr. Tawid can

16   call you at home?

17       A.   He could call.

18       Q.   Are you in the practice of allowing

19   customers to call you at home?

20       A.   Yes, I am.

21       Q.   It's a common occurrence for you?

22       A.   Yes.

23       Q.   Okay, that's fine.  And then he says he'll

24   call you tonight after 7:00.  Do you know if he

Page 99

1  called?

2      A.   Mr. Tawid called my house many times and I

3  did not answer the phone and return his calls.  At

4  this particular time I can almost guarantee I did

5  not because I was in a lot of pain.

6      Q.   From your car accident?

7      A.   It wasn't a car accident, but it was an

8  accident.

9      Q.   I mean from your accident?

10      A.   Yes.

11      Q.   Okay.  So I can be clear on the timing of

12  that, I don't mean to pry.

13      A.   No, that's fine.

14      Q.   But when did that happen again?  I think

15  you said.

16      A.   11:10, December the 21st, 2011.

17      Q.   11:10, December 21, first day of winter

18  typically.

19      A.   Yep.  My first day of vacation.

20      Q.   And it was 2011?

21      A.   Yes.

22      Q.   So from that day for some time you were not

23  communicating with people regarding business

24  because you were injured?

1     A.   I was pretty much -- yeah.  Well, my arm

2   was severed -- the bone was severed in four pieces

3   and it was not healing and I did not have the

4   surgery on it until April the 29th of 2012.

5     Q.   Okay.  Because I had asked for -- to take

6   this deposition at an earlier time and you were

7   unavailable.

8     A.   Yeah.

9     Q.   Okay.  That's fine.  So December 21 is the

10  cutoff date.  And when did you return back to work?

11    A.   I actually returned back to work in

12  February, and I want to say it was right around

13  Valentine's Day.

14    Q.   2013?

15    A.   No, 2012 with a broken arm.

16    Q.   Oh, I see, okay.

17    A.   And I -- but it was go to work and go home

18  and take all kinds of pain pills.

19    Q.   I see.

20    A.   And then I worked until April the 29th, and

21  that's when I got in for the surgery.  And then I

22  was off again until July I think.  And then I had

23  to have another surgery on my thumb.

24    Q.   All right.  You're back to work now

Page 101

1    full-time?

2        A.    I'm back to work now full-time.

3        Q.    Are you on any pain medication currently?

4        A.    Other than aspirin.

5        Q.    Okay.  As we sit here today is your

6    condition in any way preventing you from

7    understanding my questions?

8        A.    Absolutely not.

9        Q.    Or providing answers to my questions?

10       A.    No, it is not.

11       Q.    Okay.  Thank you.  So when this was sent

12   to -- to and from Mr. Tawid in March of 2012, you

13   were home?

14       A.    I -- no, I was here.  I was here.

15       Q.    Oh, you were back working?

16       A.    I was here.

17       Q.    On a limited basis?

18       A.    Right.

19       Q.    But you said he should call you.  So

20   before -- so you have a December 12th -- 14th

21   e-mail which is Exhibit 8, and a week later is when

22   you had the accident?

23       A.    Right.

24       Q.    Do you know if you had had any

Page 102

1   conversations with Mr. Tawid in that --

2       A.    I don't believe so because I believe he

3   said he was leaving on holiday.

4             MR. GROSSMAN:  Okay, I see.  Next Friday.

5   All right.  Okay.  Can we take a five-minute break?

6             MR. BARNUM:  Absolutely.

7                (WHEREUPON, a short recess was taken.)

8             (Quiggle Exhibit No. 10 was marked for

9                identification by Mr. Grossman.)

10  BY MR. GROSSMAN:

11      Q.    I think we are up to Exhibit 10.

12  Exhibit 10 is looks like I think five e-mails?

13      A.    Right.

14      Q.    On September 23rd.  It's an exchange

15  between you and Mr. Tawid.  Do you recall these

16  e-mails?

17      A.    Um-hum.

18      Q.    What do you recall regarding the

19  communications between you and Mr. Tawid?

20      A.    Mr. Tawid would ask me questions on what

21  happens and dah, dah, dah, dah, dah.  And who

22  different people was.  So I see here he had asked

23  me who the CFO was and I said Doug Martin.  He

24  wanted to know what would happen.  He also was

1    talking about the collection agency.  I think it

2    was the collection agency.  Oh, lawyers.  Okay.

3    You guys.  And I said, you know, I told him what I

4    knew.  There was nothing else.

5        Q.   Okay.  Were there telephone conversations

6    around the time that these e-mails were being sent?

7        A.   Mostly it was just e-mails.  I don't like

8    talking to Mr. Tawid on the phone because I cannot

9    understand him.

10        MR. BARNUM:  Counsel, I want to put

11    something on the record just because I hope it

12    won't be an issue later.  Exhibit 9 and Exhibit 10

13    I am seeing for the first time today.

14        MR. GROSSMAN:  Okay.

15        MR. BARNUM:  Can you confirm that these

16    documents were produced in response to our request

17    for production of documents?

18        MR. GROSSMAN:  I don't know.  I'm thinking

19    9 was, but I'm thinking 10 was not.

20        MR. BARNUM:  Okay.  And can you offer --

21    just let's meet and confer for a moment.  Can you

22    offer any explanation as to why it was not

23    produced?

24        MR. GROSSMAN:  I wasn't aware of them until

Page 104

1    I was preparing for this deposition.

2              MR. BARNUM:  And can you offer any

3    explanation as to why you didn't send them to me as

4    soon as you became aware of them as opposed to

5    putting them in front of the witness for the first

6    time and putting them in front of me for the first

7    time?

8              MR. GROSSMAN:  Probably because I was

9    getting ready to travel to Illinois as I received

10   them.  So that's the best I can tell you.  I just

11   received them.  And there will be more, and the

12   same answer would go for the next few.

13             MR. BARNUM:  Well, then I'm going to want

14   to see all of the documents that you have recently

15   acquired prior to putting them in front of this

16   witness.

17             MR. GROSSMAN:  That's not a problem.  Let's

18   go off the record.

19                  (WHEREUPON, a short recess was taken.)

20             (Quiggle Exhibit Nos. 11, 12, 13, 14, 15,

21                  16, 17, 18, 19, 20 and 21 were marked for

22                  identification by Mr. Grossman.)

23             MR. BARNUM:  Let's go back on the record

24   real quick.  I've received several documents from

1    Mr. Grossman just in the last few minutes.  Let me

2    walk through them.  And with respect to all of

3    these documents, my concern is that I have not been

4    provided these documents in advance.  And certainly

5    they were -- they fall into our request for

6    production of documents.

7            So let's start with a Thursday, October 11,

8    2012 e-mail from Ms. Quiggle to Mr. Tawid.  The

9    subject line is contact.  And it's a series of

10   e-mails back and forth between Ms. Quiggle and

11   Mr. Tawid on October 10th -- I'm sorry, starting on

12   October 9, 2012 and going through to October 11,

13   2012.

14           Second is an e-mail exchange between

15   Ms. Quiggle and Mr. Tawid dated October 8, 2012.

16           Next is an e-mail exchange between

17   Ms. Quiggle -- and by the way, these are going to

18   Ms. Quiggle's --

19           THE WITNESS:  Personal home.

20           MR. BARNUM:  -- home address at

21   RebeccaQuiggle@yahoo.com.

22           Second is an e-mail -- are e-mails -- or

23   the third, I'm sorry, e-mails dated September 24,

24   2012 to that same address.

Page 106

1            The fourth is a series of e-mails, again

2    dated September 24, 2012 between Mr. Tawid and

3    Ms. Quiggle.  On the e-mail dated September 24,

4    2012 at 12:56 p.m. Eastern Standard Time there is a

5    CC to an address of MRTK2011@ME.com.

6            Next is a series of e-mails, again two

7    e-mails between Mr. Tawid and Ms. Quiggle to her

8    yahoo account dated Sunday, September 23, 2012.

9            The next series of e-mails are e-mails

10   between Ms. Quiggle and Mr. Tawid to her personal

11   account dated September 23, 2012, e-mail exchange

12   going back and forth.

13           Next is a multi-page document.  First page

14   appears to be an Excel spreadsheet with multiple

15   colors on it with a date, time and minutes column.

16   And it is attached to what appear to be printouts

17   from a cell phone detailing calls made.  And these

18   are all calls, or at least as I skimmed through it,

19   they were calls from wireless number 954-864-5598.

20   And they are calls -- or this document details

21   calls to area code number 815-233-8641.

22           THE WITNESS:  Not all of them.

23           MR. BARNUM:  I have got to put this on the

24   record.

Page 107

```
 1              THE WITNESS:  Okay.

 2              MR. BARNUM:  Or to phone number

 3    815-233-8645 and to phone number 815-233-8613.

 4              MR. GROSSMAN:  There is more.

 5              MR. BARNUM:  Pardon me?

 6              MR. GROSSMAN:  There is some more.  You

 7    missed several numbers.

 8              MR. BARNUM:  I'm looking at the one that's

 9    got handwritten "office" at the top.

10              MR. GROSSMAN:  Oh, I'm sorry.  Okay.  My

11    mistake.  You're right.

12              MR. BARNUM:  Second set of wireless records

13    are for cell phone number 954-864-5598 to area code

14    815-80 -- well, these are handwritten "home."

15    There is a handwritten notation "home."  And so I

16    won't go through all the numbers that are

17    identified here.

18              MR. GROSSMAN:  Actually it's just one

19    number.

20              MR. BARNUM:  Okay.  So for purposes of

21    meeting and conferring on the record, Mr. Grossman,

22    is it your position that these documents were not

23    received prior to such time as they could be

24    responded or provided in response to our request
```

1    for production of documents?

2            MR. GROSSMAN:  Exhibits -- well, I can't

3    say exactly, but I believe that Exhibits 10 through

4    20 I just, as I mentioned before, just received.

5            MR. BARNUM:  Well, we haven't identified

6    them as exhibits yet.

7            MR. GROSSMAN:  Oh, I'm sorry.  Well, they

8    are marked for Ms. Quiggle's deposition already,

9    which you just referenced have been marked.  So

10   just to reference those instead of by date, just by

11   exhibit number, 10 through 20 I believe, as I

12   mentioned, I just received.  Although there may be

13   one or two mixed in that were produced, I'm not

14   certain about that.  But -- and then as far as

15   Exhibit, what number are we on?  This composite

16   exhibit, is it 20 -- no.  Ms. Quiggle, you have it.

17           THE WITNESS:  21.

18           MR. GROSSMAN:  21.  The top page I did just

19   receive.  I'm not sure whether I received the

20   other -- the two sets or not prior.  I just don't

21   know.  I know this top page was the color page was

22   prepared by my client just before leaving for the

23   depositions here.  So that's my position.

24           MR. BARNUM:  Well, these documents are all

Page 109

1   responsive to our request for production of

2   documents.  Can you state for the record when you

3   received them?

4           MR. GROSSMAN:  I just did.  I just did.

5           MR. BARNUM:  Well, I don't know what just

6   means.  Does it mean this morning or yesterday or

7   two days ago?

8           MR. GROSSMAN:  No, no, no.  I received them

9   as I was preparing to leave from Florida for

10  depositions.  I don't know exact time I received

11  them.  I don't even remember the exact date because

12  I was doing other things, so I'm not sure when I

13  received them.  But it might have been over the

14  weekend of Labor Day at some point.  I don't -- I

15  just don't recall exactly when I received them.

16  But it was not much prior to leaving from Florida,

17  which occurred on Labor Day morning I left very

18  early on the 2nd of September.

19          MR. BARNUM:  And when you say received, I

20  assume you received these from your client?

21          MR. GROSSMAN:  I did.  That's it.

22          MR. BARNUM:  Well, I am maintaining these

23  documents are responsive to our discovery request.

24  Clearly they were within your client's possession,

1   custody and control.  And I have to question why

2   they were not produced considering that we've been

3   litigating this case for nearly a year now.  And

4   discovery has been pending for an extended period

5   of time.  We've had multiple discovery --

6           MR. GROSSMAN:  Eric, I'm just going to --

7           MR. BARNUM:  I'm telling you, I'm not done.

8           MR. GROSSMAN:  I have to interrupt you

9   because you are making a motion on the record.

10          MR. BARNUM:  No, I'm not making a motion on

11  the record.

12          MR. GROSSMAN:  I'm not going to let you do

13  you that in my deposition.  State your objection.

14  I want to get through the questioning.

15          MR. BARNUM:  Well, I'm meeting and

16  conferring with you on the record so that when I

17  make my motion I can let the Court know that we

18  have met and conferred, which is our obligation

19  under the local Rules.

20          MR. GROSSMAN:  I don't want it on the

21  record then.  This is off the record.

22          MR. BARNUM:  Well, Counsel, we won't

23  continue unless it's on the record.  So we can

24  either end the deposition now or you can let me put

1    that we meet and confer on the record.

2              MR. GROSSMAN:  Continue.

3              MR. BARNUM:  These documents are clearly

4    responsive to our discovery request, and I question

5    why your client did not produce them until

6    literally days before the deposition of this

7    witness, when they clearly are communications to

8    and from a Newell employee, which is part of our

9    discovery request.

10             And so I'm going to object to any and all

11   questions regarding these documents.  And at the

12   appropriate time I will move to strike the

13   testimony from this witness based upon what I

14   consider to be surprise litigation tactics.

15             So certainly, Counsel, you are free to

16   respond before we go off the record so I can talk

17   to my client.

18             MR. GROSSMAN:  No response at this time.  I

19   reserve my right to respond.  Let's go off the

20   record.

21                 (WHEREUPON, a short recess was taken.)

22             MR. GROSSMAN:  Let's just let the record

23   reflect that the -- there was a conference between

24   Mr. Barnum and -- from my view of things, with

1  Mr. Barnum and Ms. Quiggle lasted about roughly

2  about 15 minutes, and we are back on.

3  BY MR. GROSSMAN:

4     Q.   Ms. Quiggle, you have had a chance to

5  review what we've marked as Exhibits 10 through 21?

6     A.   Yes.

7     Q.   Okay.  Let's just go through those very

8  quickly.  Exhibit 10 is a series of -- a couple of

9  e-mails, it looks like between you and Mr. Tawid.

10 Do you recall these e-mails?

11        MR. BARNUM:  Right now, Counsel, the

12 e-mails are -- the documents are not in order so we

13 are going to need to reorder them and I'm going to

14 need to make sure that I have my versions properly

15 ordered.

16        MR. GROSSMAN:  Okay.  We will go off the

17 record then.

18           (WHEREUPON, a short recess was taken.)

19        MR. BARNUM:  Let's go back on the record.

20 I just want to put one thing on the record so I

21 don't have to keep saying it over and over and over

22 again.

23        MR. GROSSMAN:  Okay.

24        MR. BARNUM:  So with respect to Exhibits

Page 113

1    10, 11, 12, 13, 17, 20 and 21, I am putting on the

2    record a running objection as to their

3    admissibility in this deposition based upon the

4    fact that they weren't produced.  And we have

5    already -- I've already given my comments on that

6    at length.  And I am placing that objection in

7    anticipation of a motion to strike them from the

8    record and any and all questions and responses

9    related to those particular exhibits.  I will put

10   that on the record so I don't have to keep saying

11   it.

12           MR. GROSSMAN:  No problem.  I understand.

13   BY MR. GROSSMAN:

14       Q.   Okay.  Let's just do this real quickly.

15   Exhibit 10, Ms. Quiggle, do you recall this

16   exchange of e-mails?

17       A.   Yes.

18       Q.   Okay.  Do you -- did you speak with Mr.

19   Tawid regarding these e-mails?

20       A.   Yes.

21       Q.   What do you recall of those conversations?

22       A.   Other than what is answered here, no.  He

23   was asking a question, that was it.

24       Q.   Okay.  The very top of the first page of

Page 114

1    Exhibit 10 is -- this is from you to Mr. Tawid.

2    The last sentence says, "Also remember that if they

3    do take you to court the court will just put you on

4    a payment plan."  Do you recall writing that?

5         A.   Yes, I did.

6         Q.   Okay.  And why did you write that?

7         A.   To try to tell Mr. Tawid that he needed to

8    get a payment plan because either way he was going

9    to pay it.

10        Q.   Did Mr. Tawid and you ever discuss a

11   payment plan?

12        A.   No.

13        Q.   Do you recall any response from Mr. Tawid

14   to this last comment regarding a payment plan?

15        A.   No, I don't.

16        Q.   Exhibit No. 11, do you recall these two

17   e-mails -- I'm sorry, three e-mails?  I apologize.

18        A.   Yes.

19        Q.   What do you recall about these e-mails?

20        A.   He asked me if he could contact or should

21   contact.  I said go ahead and contact.  I didn't

22   care who he contacted.

23        Q.   Was this a conversation you also might have

24   had by telephone with Mr. Tawid?

1      A.    I don't recall it by telephone.

2      Q.    Okay.  Strictly by the e-mails you are

3  looking at?

4      A.    (Indicated in the affirmative.)

5      Q.    Exhibit No. 12.  This is -- I don't know --

6  and I don't have any attachment because the bottom

7  of what is the first page of Exhibit 12 which has a

8  2.

9            MR. BARNUM:  That's not a question.

10     A.    I didn't get an attachment.

11 BY MR. GROSSMAN:

12     Q.    I'm sorry.  It says, "Please find attached

13 the sued."  Mr. Tawid's words to you.  Do you

14 recall if there was anything attached to this

15 e-mail?

16     A.    I don't believe there was anything

17 attached.

18     Q.    Okay.  It doesn't reference an attachment

19 in the heading at all.  And you -- in response you

20 write to Mr. Tawid, "Please contact the following

21 person for options that may be available to you.

22 Michael J. Satz, S-A-T-Z, State's Attorney, et

23 cetera."

24            Why did you provide that information to

1    Mr. Tawid?

2        A.    He kept asking me who he could contact.   I

3    didn't know anybody else.

4        Q.    Okay.   There was phone calls regarding this

5    topic?

6        A.    No, I believe it was just e-mails.

7        Q.    Okay.   And Exhibit 13, it looks like it's a

8    follow-up to Exhibit 12.   Would you agree with

9    that?

10       A.    Um-hum.

11       Q.    Was that a yes?   Ms. Quiggle?

12       A.    Pardon me?

13       Q.    Was that a yes?

14       A.    Yes.

15       Q.    Okay.   And your response to the question as

16   stated in the top of that exhibit; correct?

17       A.    Correct.

18       Q.    Okay.   The Exhibit No, 14.   The letter

19   dated September 24, 2012 from Mr. Tawid apparently

20   to Mr. Eric, addressed to Eric L. Barnum.   Do you

21   know if you've seen this letter before today?

22       A.    I don't believe I have.

23       Q.    Okay.   Did you discuss with Mr. Tawid

24   whether he would contact Mr. Barnum by telephone?

1      A.    I told him that he could contact whoever he

2  wanted to.

3      Q.    Okay.   Did you give him any information as

4  to who to contact?

5      A.    No.

6      Q.    Did you give him any information as to --

7      A.    Other than that State's Attorney.

8      Q.    Okay.   Did you speak with Mr. Tawid by

9  telephone offering any advice as to how --

10     A.    No.

11     Q.    -- or what to communicate?

12     A.    No.

13     Q.    Okay.   Exhibit No. 15, an e-mail to

14  Mrs. Phears it says, from Mr. Tawid.   And I will

15  just ask if you have seen this e-mail prior to

16  today?

17     A.    I don't believe so.

18     Q.    Okay.   It mentioned a proposal to Graco.

19  Were you familiar with any proposals submitted from

20  Flexflo to --

21     A.    No.

22     Q.    -- to Graco?   No?

23     A.    No.

24     Q.    Do you know if there were any?

Page 118

1      A.    I do not know if there was any.

2      Q.    You had no discussions with Mr. Tawid

3  regarding proposals to resolve the outstanding

4  invoices?

5      A.    Nope.

6      Q.    Same with Exhibit 16.  Have you seen these

7  e-mails before today?

8      A.    No.

9      Q.    Okay.  Exhibit 17, the bottom part says, "I

10  just received this e-mail from them."  It's dated

11  October 8th.  And I don't -- do you know what --

12  when he says this e-mail--

13      A.    No, I don't.

14      Q.    -- do you know what that references?

15      A.    No.

16      Q.    Okay.  And you write back to Mr. Tawid, "I

17  need to talk to you tonight.  I will call you from

18  home about 4 o'clock my time, 5:00 your time.

19  Cannot talk from here today."  Why did you write to

20  Mr. Tawid that you needed to talk to him?

21      A.    He has -- was asking me about -- this is

22  getting into a campaign, okay?  He wanted to do a

23  web page or a Facebook.  I did not do it.

24      Q.    Okay.

1      A.   He did not do it.  I did not give him the

2  information.  And that's pretty much what I was

3  telling him here is I was going to tell him can't

4  do that because of governing rules of campaigning.

5      Q.   Okay.  Did you actually call him as you

6  said --

7      A.   I don't believe I did.

8      Q.   Okay.  Exhibit No. 18.  This is from

9  Ms. Phears to Mr. Tawid.  Have you seen this before

10  today?

11      A.   No, I have not.

12      Q.   No. Exhibit 19.  This is a forwarding to

13  you from Mr. Tawid of an e-mail he submitted to Mr.

14  Popp.

15      A.   Right.

16      Q.   On October 8th.  He sent it to you on

17  October 9th.  And his message to you is, "I just

18  realized that I forgot to send this e-mail to you

19  last night."

20      A.   He normally would copy me on anything he

21  sent to Mr. Popp.

22      Q.   Okay.  So that e-mail was sent, looks

23  approximately 11:30 at night on Monday,

24  October 8th.  He didn't send you a copy that night,

1    but then the next morning?

2        A.    The next morning.

3        Q.    Did you read the e-mail to Mr. Popp?

4        A.    Actually, yes.

5        Q.    Okay.  Did you discuss the content of the

6    e-mail with Mr. Popp at all?

7        A.    No, I did not.

8        Q.    Okay.  Did you just discuss the e-mail with

9    Mr. Tawid?

10       A.    No, I did not.

11       Q.    Exhibit No. 20 is unfortunately the longest

12   series of e-mails.  Do you recall this series of

13   e-mails with Mr. Tawid?

14       A.    Yes, I do.

15       Q.    What do you recall?

16       A.    Miguel wanted to know if he could -- if he

17   should call Gary or if he could call Gary.  He

18   asked he wanted to know Gary's phone number.

19       Q.    Okay.

20       A.    That is his office number.  Gary obviously

21   did not answer the call.  He wanted to know if I

22   knew why Gary didn't answer the call.  I said wait

23   until tomorrow.  He had auditors in his office.  I

24   don't know what no sorry.  He called again.  Okay.

Page 121

1   No, okay.  So that's pretty self explanatory.

2       Q.   I'm sorry, which part are you referring to?

3       A.   Where I said no, sorry.  Wanting to know if

4   I knew if he was going to call or what.

5       Q.   Did he -- did Mr. Tawid mention why he

6   thought it would be a good idea for him to call and

7   speak to Mr. Popp?

8       A.   Nope.

9       Q.   Did you have any discussion with Mr. Tawid

10  regarding getting Mr. Tawid to communicate with Mr.

11  Popp to help resolve the situation?

12      A.   Nope.

13      Q.   You did not?  Composite Exhibit 21 I

14  represent is a record of phone calls made from Mr.

15  Tawid's cell phone number.

16      A.   Um-hum.

17      Q.   Did you know Mr. Tawid's cell phone number

18  to be 954-864-5598?

19      A.   No, I did not.  He had told me, but I did

20  not know it.

21      Q.   Okay.  Now, do you know if he called you by

22  his cell phone ever?

23      A.   I have no idea.

24      Q.   You don't know?

Page 122

1      A.    I don't know how he was calling.

2      Q.    Let's just look at the numbers.  On the

3    second page of Exhibit 21 the phone number is there

4    as 815-233-8641.  Do you recognize that?

5      A.    That is my work number.

6      Q.    I'm sorry?

7      A.    That is my work number.

8      Q.    Is that a direct line?

9      A.    Yes, it is.

10      Q.    So no receptionist answers and connects

11    you?

12      A.    Correct.

13      Q.    You pick up; correct?

14      A.    Um-hum.

15      Q.    Would that be a yes, ma'am?

16      A.    Yes, yes.

17      Q.    The phone number on the eleventh page of

18    this composite exhibit, I'll just tell you.  You

19    probably recognize it.  815-233-8613?

20      A.    No, I do not.

21      Q.    You do not know that number?

22      A.    (Witness indicated in the negative.)

23      Q.    Would you know if that's a Newell

24    Rubbermaid phone number?

1     A.   I could not tell you that for sure.   I

2   don't know the number.

3     Q.   Okay.  815-801-2731?

4     A.   That is my number.

5     Q.   That's your home?

6     A.   My home number.

7     Q.   It's not a cell phone?

8     A.   Nope.

9     Q.   It's your home direct line to your house,

10  okay.  Mr. Tawid has indicated that he has spoken

11  to you at length on several occasions.  The time,

12  if you look at the first page of Exhibit 21,

13  indicates date -- it's a composite of the attached

14  two sets of records --

15    A.   Um-hum.

16    Q.   -- prepared by Mr. Tawid.  And it's

17  basically repeating information below, just in a

18  spreadsheet form.  So it will show a phone call to

19  the 233-8641, for example, on the very first one

20  March 2, 2012 at 8:40 p.m. for 14 minutes.  Would

21  you -- do you -- would you agree that you spoke

22  with Mr. Tawid at that date and time for 14 minutes

23  as reflected on this record?

24         MR. BARNUM:  And, Counsel, I'll just place

1    a running objection to the introduction,

2    specifically of the what purports to be a summary

3    page prepared by Mr. Tawid.  I will first of all

4    object to it as it lacks foundation, and object to

5    its authentication.  And I object to its accuracy.

6    Just based on my own review of the records I've

7    already identified an error in your client's

8    summary.

9            MR. GROSSMAN:  Okay.

10            MR. BARNUM:  Specifically at the bottom of

11    the purported summary page there is an entry

12    in green that reflects 7/8/13 or July 8, 2013 at

13    8:05 p.m. for 53 minutes.  When I turn to the very

14    first page of the exhibit -- of the page of the

15    composite exhibit that has the "home" handwritten

16    note at the top, the sixth entry number 336, the

17    date is actually January 8, 2013.

18            MR. GROSSMAN:  Okay.

19            MR. BARNUM:  The time is 8:05 p.m.

20            MR. GROSSMAN:  I don't disagree with you.

21            MR. BARNUM:  No, I'm not done.

22            MR. GROSSMAN:  Oh, I'm sorry.

23            MR. BARNUM:  And the minutes are 53.  So --

24            MR. GROSSMAN:  I will just offer that I

Page 125

1    believe that is simply a typographical error.  But

2    your objection is noted.

3            MR. BARNUM:  Thank you.

4    BY MR. GROSSMAN:

5       Q.   Ms. Quiggle, just again referring to the

6    first page of Exhibit 21, do you know -- do you

7    have memory of speaking to Mr. Tawid on the dates

8    that are highlighted by the various colors that you

9    see?  For instance, on September 23, 2012 at

10   7:59 p.m. you spoke -- this shows a 41 minute

11   duration.  Do you know if you spoke with Mr. Tawid

12   on that date and time for the 41 minutes shown?

13   And again, the record will show at one of the later

14   pages.  I can locate it if you like.

15      A.   I can't tell you what we talked about.  I

16   don't remember.  I don't remember the dates.  I

17   just find it interesting that there was all these

18   other calls on the same day for two and one minute.

19      Q.   Okay.  Do you know if you spoke for one

20   minute?  For instance, I see what you are talking

21   about going to that same September 23rd date.

22   There is a two minute call and a one minute call.

23      A.   Those would more than likely be my

24   answering machine.

1    Q.   Okay.  Perhaps the -- okay.  We don't need

2    to speculate as to what those are, but do you have

3    any reason to dispute that the calls that are

4    reflected in color reflect time where you and Mr.

5    Tawid spoke for longer than one minute, with the

6    exception of -- and I don't know the reason they

7    are colored the way they are.  You have a March 23,

8    2012.  This is in the right column for one minute.

9    And a January 2, 2013 call for one minute.  I am

10   not sure why they are colored.  But do you dispute

11   that you spoke with Mr. Tawid during the calls that

12   appear to be reflected by this document for a time

13   longer than two minutes, let's say?

14        MR. BARNUM:  Objection.  Lacks foundation.

15   Calls for speculation.  You can answer.

16   A.   I would say that on some of these, yes, I

17   probably did talk to him.  On other times he would

18   leave very lengthy messages on my answering

19   machine.

20        MR. GROSSMAN:  I see.  For the record, let

21   me put just one comment on the record to Mr.

22   Barnum.  To potentially save time and court

23   processing, prior to preparing a motion, Mr.

24   Barnum, I would request that you perhaps

 1   communicate with me directly as to the content of

 2   what you intend to file regarding these exhibits to

 3   give me the opportunity to decide whether I will

 4   agree with that or not.  If you understand my

 5   point.

 6          MR. BARNUM:  I understand your point.

 7          (Quiggle Exhibit No. 22 was marked for

 8             identification by Mr. Grossman.)

 9          MR. GROSSMAN:  And Ms. Quiggle, I have

10   handed you Exhibit 22 which has been marked in

11   today's deposition.  Mr. Barnum, if you would let

12   me know whether or not you have received this

13   particular document prior to today's deposition so

14   we don't have the same type of objection that we

15   just had, if you don't mind.

16          I will represent to you that it was filed

17   and it's dated April 26, 2013 and served upon you

18   by mail by my local co-counsel.  I think it was

19   part of a motion for partial summary judgment, if I

20   recall.

21          MR. BARNUM:  Well, I don't see a

22   certificate of service attached.

23          MR. GROSSMAN:  It would be at the -- you're

24   right, it's not here.

1          MR. BARNUM:  I don't see a certificate of

2    service.  It's not stamped as having been

3    electronically filed on the official ECS system for

4    the Northern District of Georgia.  There is a

5    certification -- well, it's signed by Mr. Tawid.

6    There is a purported notary public certification,

7    but there is no stamp.  So I can't say whether I've

8    received this or not.  Nor can I say whether or not

9    this was actually filed by Mr. Tawid on the date

10   purportedly filed because it's not certified by a

11   notary.  So with that -- I will object to its

12   introduction and any questions to this witness

13   regarding this affidavit.

14   BY MR. GROSSMAN:

15     Q.  Okay.  Ms. Quiggle, the -- this purports to

16   be -- this is an affidavit signed by Mr. Tawid

17   before myself as a notary.  The stamp is omitted.

18   Apparently I forgot to stamp it.

19          MR. BARNUM:  Is that your signature there,

20   Counsel?

21          MR. GROSSMAN:  Yes, it is.

22          MR. BARNUM:  Okay.

23          MR. GROSSMAN:  And I am a notary and was at

24   the date it was signed and notarized by me.  Just

Page 129

1   the actual physical stamping did not occur.

2   BY MR. GROSSMAN:

3       Q.   If you would look at paragraph 11, and if

4   you would take a minute to read that, please?

5            (Short pause.)

6            Have you finished reading it?

7       A.   Um-hum.

8       Q.   Okay.  If you look -- the very -- it would

9   be the second sentence "From January 2007 --" I'm

10  reading, " -- though September, 2011, Flexflo

11  purchased from the plaintiffs a total of more than

12  3,290,000.00 in products."  And that's referencing

13  Graco products.

14           From your review of the records in handling

15  and processing collection of the Flexflo account,

16  do you know if whether or not the number of

17  3,290,000.00 for the period stated is approximately

18  accurate?

19      A.   I'd have no way of knowing.

20      Q.   You wouldn't know?

21      A.   (Witness indicated in the negative.)

22      Q.   And would that information be within

23  records that you have access to?

24      A.   Not that I would have access to.

Page 130

1          MR. GROSSMAN:  Okay.

2          (Quiggle Exhibit No. 23 was marked for

3              identification by Mr. Grossman.)

4    BY MR. GROSSMAN:

5      Q.   Ms. Quiggle, Exhibit 23 is one last --

6    well, yes, it's an affidavit signed by Mr. Tawid on

7    July 22, 2013.  And I want to ask you to look at

8    paragraph eight and take a moment to read that

9    paragraph, if you would.

10          MR. BARNUM:  I'll interpose the same

11    objection as stated with respect to Exhibit 22.

12          MR. GROSSMAN:  Okay.

13    BY MR. GROSSMAN:

14      Q.   Did you read paragraph eight, Ms. Quiggle?

15      A.   Um-hum.

16      Q.   Okay.  You see where it talks about no less

17    than 50 separate occasions where he says there

18    about reducing payments.  Do you have any knowledge

19    of the history discussed there as to whether Mr.

20    Tawid makes a true statement in paragraph eight?

21      A.   I have no way of knowing.

22      Q.   As -- you were responsible for the Flexflo

23    file?  Is that one of the files that you were

24    assigned to?

1    A.   No.

2    Q.   You were not?

3    A.   No.

4    Q.   Do you know who was?  Was anybody assigned

5  to that file?

6    A.   I -- in what capacity?

7    Q.   Collection.

8    A.   I don't believe so.  I don't know.  It was

9  not me.

10    Q.   Okay.  So that Mr. Tawid asserts in

11  paragraph eight that he was told at least 50 times

12  that he had to pay down the balance before they

13  would ship products is not anything you have

14  knowledge about?

15    A.   Absolutely nothing I had anything to do.

16    Q.   None whatsoever?

17    A.   None.

18         MR. GROSSMAN:  Okay.  I would like to take

19  a short break, do one last pass on my notes, and I

20  think we can conclude.

21         THE WITNESS:  Okay.

22         MR. BARNUM:  All right.

23         (WHEREUPON, a short recess was taken.)

24

1    BY MR. GROSSMAN:

2        Q.    Ms. Quiggle, I just want to confirm a

3    statement I believe I recall you made earlier on

4    today that you did not input notes into the SAP

5    system regarding your communication with Mr. Tawid

6    other than the only exception I recall being

7    receipt of payment.   Is that accurate?

8        A.    I don't recall I put in -- telling you I

9    put in notes of receipt of payment.

10       Q.    Okay.   Then if you would clarify for my

11   understanding of --

12       A.    I normally do not put notes in unless it is

13   specific dates someone is going to pay.

14       Q.    Okay.

15       A.    I did not have that conversation with Mr.

16   Tawid.

17       Q.    Right, okay.   So all the other

18   conversations you had and e-mails you had, those --

19   none of that would appear in the SAP system?

20       A.    No.

21       Q.    From you?

22       A.    Right.

23       Q.    Okay.   What about anybody else that you

24   might have told about that?

Page 133

1      A.    I can't answer that.  I don't know.

2      Q.    You can't answer.  Okay.  Fair enough.

3            Mr. Tawid asserts that you in communicating

4   with him by telephone suggested to him that he

5   defer paying the four invoices that are still due

6   in order to prompt Newell Rubbermaid to talk to him

7   to -- regarding the situation of the termination of

8   the distribution agreement.  Do you have any

9   recollection of making such suggestion to Mr.

10  Tawid?

11           MR. BARNUM:  Objection.  Lacks foundation.

12  It also mischaracterizes the evidence in the record

13  in this case.  But with that objection, you can

14  answer.

15     A.    No.  Conversation I had with Mr. Tawid was

16  the fact that he was not going to pay until he got

17  a -- this is my word, resolution, not what he was

18  calling it.  But some kind of an agreement.

19  BY MR. GROSSMAN:

20     Q.    Okay.

21     A.    I also informed Mr. Tawid that if he chose

22  to go down that road, he needed to make a separate

23  account and put the money into it so that he would

24  be able to pay those invoices.

Page 134

1    Q.    Okay.  How did he respond to that?

2    A.    Didn't really respond.

3    Q.    Okay.  Do you know was this communication

4  by telephone or by e-mail?

5    A.    It was by telephone.

6    Q.    Okay.  Are there any e-mails that in any

7  way touch on that topic?

8    A.    Yeah, where he says he was not going to

9  pay.

10   Q.    Okay.  Other than that?

11   A.    I don't believe so.

12   Q.    Do you recall having any conversations with

13  Mr. Tawid regarding communicating directly with

14  Graco regarding the distribution agreement and its

15  termination?

16   A.    Telling Mr. Tawid that I could not help

17  him, I know nothing about it.

18   Q.    Okay.  And did you offer any suggestions to

19  Mr. Tawid with regard to that?

20   A.    If he would ask a question should he call

21  somebody, you can call them if you want to.

22   Q.    You did not give the suggestion to call --

23   A.    No, sir.

24   Q.    -- Graco?

Page 135

1       A.    Other than the State's Attorney, which I

2    told him that's the only person I know.

3       Q.    Okay.  But as far as referencing some of

4    the Graco employees involved with Mr. Tawid's

5    account --

6       A.    Right.

7       Q.    -- you never suggested that he call them?

8       A.    No, I did not.

9             MR. GROSSMAN:  I have no further questions.

10            MR. BARNUM:  I have no questions.

11   Reserved.

12                      (WHEREUPON, the deposition was

13                       concluded at 12:48 p.m.)

14

15

16

17

18

19

20

21

22

23

24

Page 136

1                    S I G N A T U R E

2

3            I, REBECCA JANET QUIGGLE, hereby certify

4    that I have read the foregoing transcript of my

5    deposition in the case of NEWELL RUBBERMAID, INC.

6    and GRACO CHILDREN'S PRODUCTS, INC. vs. FLEXFLO

7    USA, INC., Case No. 12-CV-3262, on September 4,

8    2013, consisting of Pages 1 through 137, inclusive,

9    and have listed all corrections or changes on the

10   attached sheet, and I do again subscribe and make

11   oath that the same is a true, correct, and complete

12   transcript of my deposition as aforesaid as it now

13   appears.

14

15

16                              Deponent

17

18

19

20

21

22

23

24

Page 137

1                    C E R T I F I C A T E

2

3              I, Patricia Nunes Kotarba, Certified

4    Shorthand Reporter, Registered Professional

5    Reporter, do hereby certify that I am a court

6    reporter doing business in the city of Rockford;

7    that I reported in shorthand the testimony of

8    REBECCA JANET QUIGGLE on September 4, 2013; that

9    signature was reserved; and that the foregoing is a

10   true and correct transcript of my shorthand notes

11   so taken aforesaid.

12             I further certify that I am neither

13   counsel for nor related to or employed by any of

14   the parties to this action and that I am not a

15   relative or employee of any counsel employed by the

16   parties hereto or financially interested in this

17   action.

18             Dated at Rockford, Illinois, this 10th

19   day of September, 2013.

20

21

22

                     Patricia Nunes Kotarba
23                   Certified Shorthand Reporter
                     Registered Professional Reporter
24                   Illinois License No. 084-004570